# No. 13-55421

**IN THE**
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## THE RAY CHARLES FOUNDATION,
Plaintiff-Appellant,

v.

## RAENEE ROBINSON; RAY CHARLES ROBINSON, Jr.; SHEILA ROBINSON; DAVID ROBINSON; ROBERT F. ROBINSON; REATHA BUTLER; and ROBYN MOFFETT,
Defendants-Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA
AUDREY B. COLLINS, DISTRICT JUDGE - CASE NO. 12-CV-02725

---

# APPELLANT'S OPENING BRIEF

Yakub Hazzard
Daniel G. Stone
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2049 Century Park East, #3400
Los Angeles, CA 90067-3208
(310) 552-0130

ATTORNEYS FOR PLAINTIFF-APPELLANT
**THE RAY CHARLES FOUNDATION**

## CORPORATE DISCLOSURE STATEMENT

The Ray Charles Foundation is a nonprofit corporation.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Pages**

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF ISSUES PRESENTED .........................................................1

STATEMENT OF THE CASE............................................................................5

STATEMENT OF FACTS..................................................................................5

    A.    The Original Ownership And Transfer Of The Songs................5

    B.    The 1980 Renewal Agreement.........................................................7

    C.    Defendants' 39 Termination Notices.............................................8

    D.    The Impact of the Termination Notices on The Ray Charles Foundation...............................................................................9

    E.    Defendants' Motion to Dismiss....................................................11

SUMMARY OF THE ARGUMENT.................................................................16

STANDARD OF REVIEW ...............................................................................18

ARGUMENT.....................................................................................................19

I.    THE TERMINATION PROVISIONS OF THE 1976 COPYRIGHT ACT AND THEIR FAILURE TO ADDRESS STANDING......................................................................................19

II.    THE FOUNDATION HAS ADEQUATELY ALLEGED ARTICLE III STANDING ......................................................................24

III.    THE FOUNDATION HAS STANDING UNDER THE COPYRIGHT ACT AND THE DISTRICT COURT'S RULING TO THE CONTRARY WAS IN ERROR..................................27

    A.    The Foundation Has Standing Under the Copyright Act to Challenge Defendants' Notices of Termination....................27

i

1.  The Foundation Has Alleged Beneficial Ownership of The Copyrights At Issue ..................................................27

2.  17 U.S.C. Section 501 is the Sole Standing Provision of the 1976 Copyright Act and Confers Standing on The Foundation to Maintain an Action for Infringement ..........................................................................29

3.  The Regulation Enacted By the Register of Copyrights at 37 C.F.R. §201.10(f)(6) Is Controlling and Confers Standing on the Foundation As a Beneficial Owner ...................................................................31

4.  The Overall Context and Policy of The 1976 Act Strongly Favor Conferring Standing on Beneficial Owners to Challenge Termination Notices......................39

B.  The District Court Erred in Finding that the Foundation Is Not Within the Zone of Interests of Sections 203 and 304 ........45

IV.  THE DISTRICT COURT ERRED BY FAILING TO GRANT THE FOUNDATION LEAVE TO AMEND ....................................................50

CONCLUSION .....................................................................................51

STATEMENT OF RELATED CASES .................................................53

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ................................54

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Alaska v. Babbitt,*
72 F.3d 698 (9th Cir. 1995) *cert. denied,* 517 U.S. 1187 (1996) .................33

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
501 U.S. 104 (1991) ..........................................................40, 41, 42

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ..................................................................25

*Baker v. Carr,*
369 U.S. 186 (1962) ..............................................................25, 46

*Bennett v. Spear,*
520 U.S. 154 (1997) ..................................................................47

*Briscoe v. LaHue,*
460 U.S. 325 (1983) ..................................................................42

*Burns v. U.S.,*
501 U.S. 129 (1991) ..................................................................41

*Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.,*
836 F.2d 599 (D.C. Cir. 1988) ....................................................33

*Cent. Delta Water Agency v. U.S.,*
306 F.3d 938 (9th Cir. 2002).......................................................18

*Cetacean Cmty. v. Bush,*
386 F.3d 1169 (9th Cir. 2004).....................................................45

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ............................................................ passim

*City of Arlington v. FCC,*
569 U.S. ___, 133 S. Ct. 186 (2013) ....................................33, 34, 38

iii

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................48

*Classic Media, Inc. v. Mewborn*,
    532 F.3d 978 (9th Cir. 2008)...................................................31

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) ...........................................................40, 41

*Colony Cove Props., LLC v. City of Carson*,
    640 F.3d 948 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 456 (2011) ...............18

*Cortner v. Israel*,
    732 F.2d 267 (2d Cir. 1984) ...........................................28, 30, 36

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003)..................................................50

*FDIC v. Meyer*,
    510 U.S. 471 (1994) ................................................................49

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................50

*Fred Ahlert Music Corp. v. Warner/ Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998)........................................................7

*Green v. Bock Laundry Mach. Co.*,
    490 U.S. 504 (1989) ................................................................39

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952) ................................................................40

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010)..................................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................26

*Manning v. Miller Music Corp.*,
    174 F. Supp. 192 (S.D.N.Y. 1959)...........................30, 36, 41, 47

*Marascalco v. Fantasy, Inc.,*
    953 F.2d 469 (9th Cir. 1991) ................................................................ passim

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ......................................................................................25

*Mills Music Inc. v. Snyder,*
    469 U.S. 153 (1985) ......................................................................................24

*Milne v. Stephen Slesinger, Inc.,*
    430 F.3d 1036 (9th Cir. 2005) *cert. denied,* 548 U.S. 904 (2006) ...............31

*Mir v. Little Co. of Mary Hospital,*
    844 F.2d 646 (9th Cir. 1988) ..........................................................................5

*Moran v. London Records, Ltd.,*
    827 F.2d 180 (7th Cir. 1987) ................................................................ passim

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust,*
    522 U.S. 479 (1998) ................................................................................46, 47

*NLRB v. Amax Coal Co.,*
    453 U. S. 322 (1981) ....................................................................................40

*Outdoor Media Group, Inc. v. City of Beaumont,*
    506 F.3d 895 (9th Cir. 2007) ........................................................................18

*PAE Gov't Servs., Inc. v. MPRI, Inc.,*
    514 F.3d 856 (9th Cir. 2007) ........................................................................28

*Penguin Group (USA) Inc. v. Steinbeck,*
    537 F.3d 193 (2d Cir. 2008) ........................................................................24

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988) .........................................................................................25

*Polich v. Burlington Northern, Inc.,*
    942 F.2d 1467 (9th Cir. 1991) ......................................................................51

*Pye v. Mitchell,*
    574 F.2d 476 (9th Cir. 1978) .............................................................30, 36, 41

*Schellberg v. Empringham*,
  36 F.2d 991 (S.D.N.Y. 1929) .......................................................30

*Siegel v. Warner Bros. Entm't, Inc.*,
  542 F. Supp. 2d 1098 (C.D. Cal. 2008)...................................7, 24

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005)................................................19, 28

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ...................................................................34

*Stewart v. Abend*,
  95 U.S. 207 (1990) ................................................................20, 23

*Ted Browne Music Co. v. Fowler*,
  290 F. 751 (2d Cir. 1923) ...........................................................30

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*,
  368 F.3d 1053 (9th Cir. 2004)....................................................48

*U.S. v. Boisdore's Heirs*,
  49 U.S. (8 How.) 113 (1850) .......................................................40

*U.S. v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011)......................................................51

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
  484 U.S. 365 (1988) ...................................................................40

*Yount v. Acuff Rose-Opryland*,
  103 F.3d 830 (9th Cir. 1996).................................................28, 47

**Statutes**

12 U.S.C. § 1759.........................................................................46

17 U.S.C. § 101.....................................................................19, 40

17 U.S.C. § 102.....................................................................19, 21

17 U.S.C. § 203................................................................ passim

17 U.S.C. § 302.................................................................19, 21

17 U.S.C. § 303.........................................................................21

17 U.S.C. § 304................................................................ passim

17 U.S.C. § 501................................................................ passim

17 U.S.C. § 701.................................................................31, 34

17 U.S.C. § 702.................................................................32, 34

28 U.S.C. § 1291........................................................................1

28 U.S.C. § 1294........................................................................1

28 U.S.C. § 2107........................................................................1

28 U.S.C. § 1331........................................................................1

28 U.S.C. § 1338........................................................................1

Copyright Act of March 4, 1909 § 23 ......................................... 19, 20

Copyright Act of March 4, 1909 § 36 ...............................................36

**Treatises**

Melville B. Nimmer and David Nimmer,
    Nimmer on Copyright (2012)............................................31, 47

**Rules**

Fed. R. App. P. 4 ........................................................................1

Fed. R. Civ. P. 12.....................................................................18

Fed. R. Civ. P. 15.....................................................................50

Fed. R. Evid. 609.....................................................................39

**Regulations**

37 C.F.R. § 201.10 ........................................................................................ passim

**Legislative History**

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 124,
    *reprinted in* 1976 U.S. Code Cong. & Ad. News 5659 ........................24, 28

## STATEMENT OF JURISDICTION

The Ray Charles Foundation (the "Foundation") sued Defendants-Appellees (hereinafter, "Defendants") in the Central District of California. (2 ER 68.)  The Foundation asserted federal question jurisdiction. 28 U.S.C. §§ 1331, 1338(a).

On February 11, 2013, the district court entered final judgment in favor of Defendants.  (1 ER 66-67.)  The Foundation filed a timely notice of appeal on March 11, 2013.  (2 ER 140-41.)  This Court has jurisdiction under 28 U.S.C.  §§ 1291, 1294(1) and 2107(a).  S*ee also* Fed.  R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED

This appeal involves an issue of first impression: whether a beneficial owner of a copyright has standing to challenge a notice of termination of a transfer of that copyright pursuant to which that beneficial owner receives royalties.

The Foundation is the legal heir and successor-in-interest to the late Ray Charles Robinson, p/k/a Ray Charles ("Ray Charles" or "Mr. Charles").  During his lifetime, Mr. Charles transferred the copyrights in the compositions at issue to Progressive Music Publishing Co. ("Progressive") in exchange for the right to receive royalties from the

exploitation of those compositions. Warner/Chappell Music Publishing, Inc. and its affiliates (collectively, "Warner/Chappell") are the successors-in-interest to Progressive.

As the legal heir and successor-in-interest to the late Ray Charles, the Foundation is the beneficial owner of the late Mr. Charles' copyrights, and has received royalties derived from Warner/Chappell's exploitation of Mr. Charles' compositions for years. Pursuant to Mr. Charles' wishes, the Foundation has used those proceeds to provide charitable grants and assistance to the hearing impaired and to assist social, educational and academic advancement programs.

Defendants are seven of Mr. Charles' adult children who served Warner/Chappell with notices of terminations of Mr. Charles' copyright transfers. In an effort to preserve its beneficial ownership and right to continue receiving certain royalties from the exploitation of the copyrights, the Foundation filed an action seeking declaratory and injunctive relief challenging the propriety and effective dates (if any) of the termination notices. The Foundation's Complaint also included a claim for breach of contract.

The district court granted Defendants' motion to dismiss finding that the Foundation lacked standing to challenge Defendants' termination notices.[1] The district court also granted Defendants' special motion to strike the breach of contract claim and subsequently awarded Defendants attorneys' fees in connection with the motion to strike. The Foundation does not seek review of the granting of the motion to strike or attorneys' fee award.

The district court erred in finding that the Foundation lacks standing to challenge the notices of termination of transfers served pursuant to Sections 203 and 304 of the Copyright Act, found at 17 U.S.C. §§ 203 and 304 ("Sections 203 and 304"). It is undisputed that if Defendants were to succeed in terminating Mr. Charles' copyright transfers, the Foundation would lose a substantial portion of its beneficial ownership and resulting proceeds from the exploitation of Mr. Charles' copyrights.

---

[1] In its Complaint, the Foundation alternatively pled that Mr. Charles' compositions are works-for-hire owned by third party corporations, and therefore no termination rights exist. For purposes of this appeal, the Foundation concedes that the works at issue are not works for hire, and seeks a determination only of whether the Foundation has standing as a beneficial copyright owner to challenge Defendants' termination notices.

As a beneficial owner of Mr. Charles' copyrights, the Foundation has standing to challenge Defendants' termination notices. While Sections 203 and 304 do not expressly confer standing on any party to challenge a termination of transfer, the sole standing provision in the 1976 Copyright Act is 17 U.S.C. § 501 ("Section 501"). Section 501(b) expressly confers standing on beneficial owners such as the Foundation.

Moreover, the regulations promulgated by the Register of Copyrights, which under Supreme Court precedent are entitled to judicial deference, confirm the Foundation's standing. Those regulations provide that *any party* (not just the transferee whose rights are being terminated) may challenge a termination notice in a court of competent jurisdiction. *See* 37 C.F.R. § 201.10.

The district court committed reversible error in disregarding Section 501 of the Copyright Act and the Copyright Register's regulations by finding that the Foundation lacks standing under Sections 203 and 304.

(The addendum contains copies of pertinent statutes, rules, regulations, legislative history, and authorities.)

## STATEMENT OF THE CASE

In 2012, the Foundation filed a complaint seeking declaratory and injunctive relief, alleging breach of contract, and alleging breach of the implied covenant of good faith and fair dealing.  The Foundation's claims arise from Defendants' service of 39 termination notices, each concerning copyrighted compositions of the late Ray Charles.  (2 ER 80-83.)  On January 25, 2013, the district court granted Defendants' (1) special motion to strike the Foundation's state law claims (anti-SLAPP), and (2) motion to dismiss the Foundation's claim for declaratory and injunctive relief for lack of standing.  (1 ER 39-65.)  The Foundation only appeals that portion of the Order granting the motion to dismiss.

## STATEMENT OF FACTS[2]

### A.    The Original Ownership And Transfer Of The Songs

During the 1950s, Ray Charles signed several successive Musicians Services Agreements (the "Musicians Agreements") with Atlantic Records

---

[2] Because the Foundation's appeal is limited to the district court's ruling on the motion to dismiss, the recitation of facts is based on the allegations in the Foundation's Complaint, the documents referenced in the Complaint and those matters subject to judicial notice.  *See Mir v. Little Co. of Mary Hospital*, 844 F.2d 646, 649 (9th Cir. 1988).  Moreover, because the Foundation no longer advances its work-for-hire argument, the factual recitation only contains those factual allegations relevant to the Foundation's beneficial ownership status.

("Atlantic") covering different time periods. (2 ER 77 at ¶25.) Under these agreements, Ray Charles received an advance payment based on the number of songs he would record, as well as royalty payments based on the number of records sold. (2 ER 77 at ¶25.) The Foundation is the successor-in-interest to Mr. Charles' rights under the Musicians Agreements and is entitled to receive, and has been receiving, the royalty payments under these agreements. (*Id.*)

At the same time that Ray Charles was under contract as a recording artist with Atlantic, he was also engaged as a songwriter. (2 ER 77-78 at ¶26.) When Ray Charles created musical compositions, a copyright registration would be filed with the Copyright Office listing Mr. Charles as both the author and copyright claimant. (2 ER 126-27.) Ray Charles would then transfer legal ownership of the compositions to Progressive pursuant to individual so-called single songwriter agreements entitled "Standard Uniform Songwriters Contract" (the "Songwriters Contracts"). (2 ER 78 (at ¶27), 122-24.)

Under the terms of the Songwriters Contracts, in exchange for the copyright assignment, Ray Charles received: (1) a one dollar advance on his royalty payments; (2) a royalty for every sale of sheet music of the song

6

in the United States and Canada; (3) a royalty for every sale of an arrangement of the song in the United States and Canada; and (4) a royalty for every sale of the associated rights of the song in the United States and Canada. (The United States royalties of Items (2)-(4) above shall be referred to as the "Domestic Royalties.")[3] (2 ER 78 at ¶27.) In addition to these Domestic Royalties, pursuant to the same Songwriters Contracts, Ray Charles also received a royalty for every sale of the song outside of the United States and Canada. (*Id.*) Again, the Foundation is the successor to Mr. Charles' rights under the agreements, and has been receiving, and, unless the termination notices are deemed effective, will continue to receive the Domestic Royalties under the agreements. (2 ER 83 at ¶40.)

## B. The 1980 Renewal Agreement

In 1980, Rightsong Music, Inc. ("Rightsong"), the successor-in-interest of Progressive at the time, and Ray Charles, renegotiated their relationship pertaining to the musical compositions that are the subject of

---

[3] Foreign rights (including royalties from the exploitation of the works in Canada and other foreign countries) are exempt from termination under Sections 203 and 304. *See* §§ 203(b)(1) and (5), 304 (c)(6)(A) and (E); *Fred Ahlert Music Corp. v. Warner/ Chappell Music, Inc.*, 155 F.3d 17, 20 (2d Cir. 1998); *Siegel v. Warner Bros. Entm't, Inc.*, 542 F. Supp. 2d 1098, 1142 (C.D. Cal. 2008).

this appeal (the "1980 Agreement"). (2 ER 79 at ¶29.) The 1980 Agreement covered two distinct categories of songs: (1) the musical compositions that Ray Charles had already assigned to Progressive pursuant to the Songwriter Contracts (the "Assigned Compositions"); and (2) musical compositions that Mr. Charles had written but had not been previously assigned to any music publisher (the "Unassigned Compositions"). (2 ER 79 at ¶29.)

Pursuant to the terms of the 1980 Agreement, in addition to continuing to receive the royalties pursuant to his original Songwriters Contracts, Ray Charles received a significant cash payment in "further consideration for the grants [relating to the Unassigned Compositions], [and] acknowledgments and confirmations [relating to the Assigned Compositions]." (*Id*. at ¶30.)

### C.    Defendants' 39 Termination Notices

On March 1, 2010, Defendants served thirty-nine separate notices of termination of transfers on the publisher transferees' successor-in-interest, Warner/Chappell. (2 ER 80-81 (at ¶¶34-35), 91-92, 129-39.) The termination notices concerned the transfers of fifty-one musical compositions, all of which are subject to the 1980 Agreement. (2 ER 81 at

8

¶35.)  The earliest termination date chosen by Defendants for the works

that are the subject of this action is April 1, 2012.  (*Id.*)  All of the songs at

issue have more than one proposed termination date because Defendants

served termination notices on all registrations that they could find

pertaining to these compositions.  (2 ER 81 at ¶36.)

### D.   The Impact of the Termination Notices on The Ray Charles Foundation

The Foundation was created by Ray Charles during his lifetime (it

was originally called The Robinson Foundation for Hearing Disorders, Inc.,

and later legally changed its name to The Ray Charles Foundation).

Pursuant to Mr. Charles' comprehensive estate plan, the Foundation is the

sole beneficiary of Ray Charles' estate, and owns all of Ray Charles' rights,

title, and interest in his intellectual property and contract rights.[4]  (2 ER 71-

72, 80, 83, 86 at ¶¶5, 33, 40, 49, 50.)

The Foundation's purpose has been to administer funds for scientific,

educational and charitable purposes; to encourage, promote and educate,

---

[4] Ray Charles' children were expressly excluded from Mr. Charles' estate plan as each child received a separate irrevocable trust in the amount of $500,000 plus all associated taxes.  (2 ER 79-80 at ¶31.)  In exchange, each child signed a statement by which he or she (1) acknowledged and agreed that he or she would not inherit anything from Ray Charles' estate, and (2) waived any right to make a claim against Ray Charles' estate.  (2 ER 80 at ¶32.)

through grants to institutions and organizations, as to the causes and cures for diseases and disabilities of the hearing impaired; and to assist organizations and institutions in their social, educational, and academic advancement of programs for the youth, and carry on other charitable and educational activities associated with these goals as allowed by law. (2 ER 71-72 at ¶5.) The Foundation has provided substantial financial donations to various institutions involved with areas of hearing diseases and cures, as well as other educational resources for the needy. (*Id.*) The Foundation depends upon the income received from the intellectual property and contract rights to continue the wishes of Ray Charles and the Foundation's purpose. (*Id.*)

Among the rights held by the Foundation is the right to receive royalty payments from the exploitation of musical compositions written by Ray Charles during his lifetime, including those that are the subject of this action. (*Id.*) As a result, if given effect, the termination of copyright transfer notices served by Defendants will adversely affect these royalty payments, thus injuring the Foundation. (*Id.*) If Defendants' terminations are deemed proper and effective, the Foundation would lose its right to

continue to receive the Domestic Royalties from the compositions that are

the subject of the notices.  (2 ER 71-72, 83 at ¶¶5, 40.)

### E.    Defendants' Motion to Dismiss

On March 29, 2012, the Foundation filed its complaint in this matter.

(2 ER 68.)  The Foundation's first claim for declaratory and injunctive relief

sought, in pertinent part, a declaration that (1) Defendants' terminations

are invalid because they "attempt to nullify a renegotiation entered into in

good faith by Ray Charles and his publisher at the time as evidenced by the

1980 Agreement, in violation of the 1976 Copyright Act;" (2) "the operative

transfers for the Assigned Compositions are those contained in the 1980

Agreement and that therefore the effective date of termination must be

computed from the 1980 Agreement;" and (3) as to the unpublished

Unassigned Compositions "the effective date of termination chosen by

Defendants is incorrect given that the transfer contained in the 1980

Agreement of the unpublished Unassigned Compositions included the

publication right which was not exercised within five years from transfer."

(2 ER 84-85 at ¶43.)  Furthermore, the Foundation asked "[t]hat the Court

determine which of the multiple terminations pertaining to each individual

musical composition is the operative one, if any."  (*Id.*)

On July 3, 2012, Defendants filed a Notice of Motion and Motion to Strike Plaintiff's State Law Causes of Action pursuant to California's Anti-SLAPP Law, and a Notice of Motion and Motion to Dismiss Plaintiff's First, Second, and Third Claims ("Motion to Dismiss"). (ECF Nos. 15, 16.) In the Motion to Dismiss, Defendants contended, in pertinent part, that the Foundation lacks standing because it "effectively attempts to assert not its own legal rights, but the purported rights of third party Warner/Chappell Music." (2 ER 98.) Defendants argued that the Foundation therefore lacked standing based on the prudential limitation against third party standing. (2 ER 99-101.)

The Foundation opposed the Motion to Dismiss. (ECF No. 19.) In its Opposition, the Foundation contended, among other things, that it is the beneficial owner of the copyrights at issue, that there is no precedent holding that only a legal owner of copyright has standing to bring a claim under the Copyright Act, and explained how the Foundation would be injured by Defendants' termination notices, *i.e.*, by losing a portion of its beneficial ownership of those copyrights and the revenues derived therefrom. (2 ER 102-107.) In their Reply in Support of the Motion to Dismiss, Defendants argued that, among other things, the Foundation

could not claim to be the beneficial owner of Ray Charles' compositions because it alleged in the Complaint that those compositions were works made for hire.  (2 ER 108-09.)

On September 24, 2013, the district court issued a tentative decision and heard oral arguments on the Motion to Dismiss.  (1 ER 36.)  In its tentative decision, the district stated "that [the Foundation] lacked standing under the Copyright Act because it was neither an heir nor a recipient of the termination notices as set forth in 17 U.S.C. §§ 203 and 304(c) . . . . [and] that [the Foundation] lacked prudential standing because it was really asserting the rights of Warner/Chappell Music. . . ."  (1 ER 37.)  At oral argument, the Foundation pointed out that it had alleged an alternative theory in the event that the compositions were not deemed to be works made for hire.  Specifically, the Foundation highlighted the factual allegations in the complaint supporting its beneficial ownership of the copyrights whose transfers were the subject of the termination notices.  (1 ER at 8:21-11:17.)  On September 25, 2013, the Court requested additional briefing on two questions: (1) whether, assuming the Foundation is the "beneficial owner" of the copyrights, it has standing under §§ 304(c) and 203(a) "as a 'grantee' of an 'exclusive or nonexclusive grant of a transfer or

license' of any right under the copyrights;" and (2) whether, given the allegations in the current complaint, the Foundation can "allege facts to support a claim that the works were not works made for hire consistent with Rule 11." (1 ER 37-38.)

Pursuant to the district court's request, on October 2, 2012, the Foundation and Defendants submitted supplemental briefs addressing the above-referenced questions. (ECF Nos. 32, 33.) In its brief, the Foundation re-iterated that it had alleged in the Complaint that it was the successor-in-interest and legal heir to Ray Charles, that Ray Charles wrote the songs that are the subject of the termination notices, and that Ray Charles assigned the copyrights in the composition pursuant to the Songwriter Contracts. (2 ER 110-11.) As such, the Foundation sufficiently alleged it is the beneficial owner of Mr. Charles' copyrights (although it could allege additional facts to that end). (*Id*.) The Foundation went on to argue that, as a beneficial owner, it has standing to sue under Section 501(b) of the Copyright Act and falls within the zone of interests of Sections 203 and 304. (2 ER 112-120.) The Foundation also advised the district court of the regulations promulgated by the Register of Copyrights in 37 C.F.R. § 201.10(f)(6), addressed below, which allow for "any party" to challenge a notice of

termination, "including before a court of competent jurisdiction." (2 ER 115-116.)

On January 25, 2013, the Court granted Defendants' Motion to Strike and Motion to Dismiss. (1 ER 39-65.) In granting the Motion to Dismiss, the district court found that "the Foundation's interests do not fall within the 'zone of interests' the termination provisions were meant to protect, and it lacks third-party standing to assert the interests of Warner/ Chappell." (1 ER 57.) The district court first found that Sections 203 and 304 "do not define who may challenge termination notices. . . ." (1 ER 60.) The court went on to find that "because Congress took care to include beneficial owners in § 501(b), it must have also purposefully excluded beneficial owners from §§ 304(c) and 203." (1 ER 62.) In so finding, the district court "reject[ed] the Foundation's argument that a passing reference to 'any party' in the regulations implementing §§ 304(c) and 203 alters the plain text of those sections to allow a beneficial owner of a copyright to challenge a termination notice." (*Id*. at n.13.) The district court entered judgment in favor of Defendants on February 11, 2013. (1 ER 66-67.)

## SUMMARY OF THE ARGUMENT

The district court erred in concluding that the Foundation, as the beneficial owner of the late Ray Charles' copyrights at issue, lacks standing to challenge Defendants' notices of termination pursuant to Sections 203 and 304 of the 1976 Copyright Act. The district court correctly concluded that the Foundation has Article III standing to challenge Defendants' notices of termination. However, the district court incorrectly ruled that the Foundation, as a beneficial owner, lacks prudential standing under the termination provisions of the 1976 Copyright Act (the "1976 Act"). For various reasons, the district court's finding that a beneficial owner lacks standing to challenge a notice of termination is in error.

In finding that the Foundation lacks standing to challenge a termination notice, the district court summarily disregarded a regulation of the Register of Copyrights providing that "any party" has standing to challenge a notice of termination before a court of competent jurisdiction. In doing so, the district court not only failed to defer to the regulations of an administrative agency, but also crafted its own unfounded interpretation of the termination provisions of the 1976 Act. The district court's conclusion that the termination provisions imply a standing

16

requirement distinct from the sole standing provision of the 1976 Act ignores basic rules of statutory construction, including the requirement that the court review the termination provisions in the context of the entire 1976 Act.

The district court's interpretation of the termination provisions is unsupported by the plain language of the 1976 Act, by its legislative history, or by case law. Not only is the district court's interpretation of those provisions unfounded, but that interpretation also ignores nearly a century of case law conferring standing on beneficial owners of copyright. That precedent was codified in the sole standing provision of the 1976 Act, the same act in which Congress enacted Sections 203 and 304.

Finally, the district court's conclusion that a beneficial owner lacks standing to challenge a notice of termination would create an internal inconsistency within copyright law. On one hand, a beneficial owner unquestionably has standing to file suit for infringement. On the other hand, under the district court's interpretation, that same beneficial owner would be powerless to challenge an attempt to terminate the very transfer on which its beneficial ownership is founded. That beneficial owner would have to stand by idly and be stripped of its ownership interests, even

17

where the notice of termination is facially deficient. It would simply make no sense to allow a beneficial owner to file suit for infringement but not allow that beneficial owner to file suit challenging the outright termination of its ownership interests.

## STANDARD OF REVIEW

The Court reviews *de novo* the district court's grant of a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *See Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 456 (2011). When reviewing a grant of dismissal pursuant to Rule 12(b)(1), "[t]he court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the non-moving party." *Id*. *citing Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). At this stage of the pleading, the Foundation need only show that the facts alleged, if proved, would confer standing upon it. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010) *citing Cent. Delta Water Agency v. U.S.*, 306 F.3d 938, 947 (9th Cir. 2002). To establish standing, the Foundation must allege facts sufficient to support both Article III standing and standing under the 1976 Copyright Act. *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 883-84

18

(9th Cir. 2005).  Finally, where the issues on appeal involve pure questions

of law, the Court reviews the district court ruling *de novo*.  *Silvers*, 402 F.3d

at 883; *see also Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 470 (9th Cir. 1991).

## ARGUMENT

## I.    THE TERMINATION PROVISIONS OF THE 1976 COPYRIGHT ACT AND THEIR FAILURE TO ADDRESS STANDING

In 1976, Congress passed a completely new Copyright Act.  *See* 17

U.S.C. §§ 101 *et seq.*  The 1976 Act reformed numerous aspects of the

previous Copyright Act passed in 1909 (the "1909 Act.")  In particular, and

most relevant to this action, the 1976 Act changed the way in which federal

copyright protection would begin, the methodology for calculating the

duration of copyright protection, and the length of such copyright

protection.  *See* 17 U.S.C. §§ 102, 302(a).

The 1909 Act had a complicated system for determining the

commencement of federal copyright protection.  In short, some form of

publication of the work with notice, or registration of the work with notice,

was required before a copyright owner could benefit from federal

protection of his work.  *See* Copyright Act of March 4, 1909, ch. 320, § 23, 35

Stat. 1075.  As such, the mere completion of a copyrightable work did not

automatically trigger federal copyright protections. *See* Copyright Act of March 4, 190, § 23.

The change in the way federal copyright protection attached to works from the publication/registration system to the fixation system also necessitated a change in the methodology for determining the length of copyright protection. Under the 1909 Act, copyright authors were granted a 28-year term of federal copyright protection that would begin at the date of publication and/or registration with the Copyright Office. *Id.* At the end of that 28-year term, so long as certain formalities were adhered to, the author of the copyrighted work could renew the copyright term for an additional 28 years. *Id.* The stated reason to have two 28-year terms was to give the original author of the copyrighted work (who would often have to sell his or her rights during the first term at a low price) a second chance to capitalize on the worth of his work if the copyrighted assets at issue became more valuable in the intervening years. *See Stewart v. Abend*, 495 U.S. 207, 229 (1990). The 1976 Act changed the methodology to determine the date of commencement of federal copyright protection to a system where copyright protection begins from the date the work was fixed in a tangible medium, and lasts the length of the lifetime of the author plus 50

20

years (later amended to 70 years) following the author's death. In other words, the duration of copyright protection methodology changed from a renewable fixed term of years to a variable unitary term. *See* 17 U.S.C. §§ 102, 302(a).[5]

The change from the renewable fixed term of years to a variable unitary term would have resulted in removing the author's ability to recapture a transferred copyright roughly half way through the term and renegotiate its transfer on better terms (should the pertinent asset have increased in value in the intervening time). To avoid this result, and preserve the author's ability to renegotiate the terms of copyright transfer following an increase in value of the copyrighted asset, Congress enacted a new system which it termed "termination of transfers."

The termination of transfers provisions of the 1976 Act (17 U.S.C. §§ 203 and 304(c)) allow, under a narrow set of statutorily defined circumstances, the original grantor (or a majority of those persons identified in the statute in the event the author is deceased) to recapture the copyright from the original grantee for works that entered into federal

---

[5] The duration of copyright protection was subsequently extended by the Copyright Term Extension Act of 1988. *See* 17 U.S.C. §§302, 303.

copyright protection under both the 1909 Act and the 1976 Act. These termination of transfer provisions do not apply to works that were created as works made for hire. *See* 17 U.S.C. §§ 203(a), 304(c).

As to works that entered into federal copyright protection under the 1909 Act and whose transfer occurred prior to January 1, 1978, should the narrowly defined set of circumstances delineated in the statute apply, the termination of transfers provisions allow, in pertinent part, for the original grantor (or a majority of those persons identified in the statute in the event the author is deceased) to serve valid termination notices upon the current holders of the copyright during a specified window so that termination can be effected during a five year window beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later. *See* 17 U.S.C. § 304(c)(2)-(4).

As to works that entered into federal copyright protection under the 1976 Act and whose transfer therefore occurred after January 1, 1978, should the narrowly defined set of circumstances delineated in the statute apply, the rules governing termination depend on whether a work was already published at the time of the transfer. For those works that were published as of the date of the transfer, the termination of transfers

22

provisions allow, in pertinent part, for the original grantor (or a majority of those persons identified in the statute in the event the author is deceased) to serve valid termination notices upon the current holders of the copyright during a specified window so that termination can be effectuated between thirty-five and forty years from the date of the transfer.  As to works that were unpublished at the time of the transfer, the scheme is exactly the same as for similarly-situated published works except that the termination can only be effectuated by valid notice between forty and forty-five years from the date of the transfer (unless the works are then subsequently published within the first five years of the transfer in which case the termination can be effectuated by valid notice between thirty-five and forty years from the date of such publication). *See* 17 U.S.C. § 203(a)(2)-(4).

Terminations were "part of a compromise package involving the controversial and intertwined issues of initial ownership, duration of copyright, and reversion of rights."  *Stewart*, 495 U.S. at 225-26 (internal citations and quotation marks omitted).  The purpose of the termination right is the Copyright Act's promise "to give the author a second chance to control and benefit from his work and to secure to the author's family the opportunity to exploit the work if the author died."  *Penguin Group (USA)*

*Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008) (internal citations and quotation marks omitted). "[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Congress concluded that "[a] provision of this sort [was] needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 124, *reprinted in* 1976 U.S. Code Cong. & Ad. News 5659 at 5740; *see also Siegel*, 542 F. Supp. 2d at 1139.

Notably, in enacting the termination provisions and making the comprehensive revisions to the Copyright Act, Congress did not identify which parties, if any, have standing to challenge a notice of termination of transfer.

## II. THE FOUNDATION HAS ADEQUATELY ALLEGED ARTICLE III STANDING

The Foundation has Article III standing to assert its claim for declaratory and injunctive relief. The district court held that the

Foundation adequately alleged Article III standing in the Complaint, and

Defendants did not contest the Foundation's Article III standing before the

district court. (1 ER 59.)

Article III of the United States Constitution limits federal court

jurisdiction to cases and controversies. Where a party initiates a claim in

connection with a federal statute, that party has Article III standing where

it "'demonstrate[s] a realistic danger of sustaining a direct injury as a result

of the statute's operation or enforcement.'" *Pennell v. City of San Jose*, 485

U.S. 1, 8 (1988) *quoting Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.

289, 298 (1979). As the United States Supreme Court has made clear, "the

gist of the question" of standing is whether a plaintiff has "such a personal

stake in the outcome of the controversy as to assure that concrete

adverseness which sharpens the presentation of issues upon which the

court so largely depends for illumination." *Baker v. Carr*, 369 U.S. 186, 204

(1962) (internal citations omitted); *see also Massachusetts v. EPA*, 549 U.S.

497, 516 (2007).

The Supreme Court has explained that:

> the irreducible constitutional minimum of standing
> contains three elements. First, the plaintiff must
> have suffered an injury in fact -- an invasion of a

25

> legally protected interest which is (a) concrete and
> particularized … and (b) actual or imminent, not
> conjectural or hypothetical.  Second, there must be a
> causal connection between the injury and the
> conduct complained of -- the injury has to be fairly
> traceable to the challenged action of the defendant,
> and not the result of the independent action of some
> third party not before the court.  Third, it must be
> likely, as opposed to merely speculative, that the
> injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992) (internal citations,

punctuation, and quotation marks omitted).[6]

As the district court found, the Foundation has clearly alleged Article

III standing.  In its first claim for declaratory and injunctive relief, the

Foundation has alleged a direct and tangible injury (the loss of the revenue

derived from its share of the Domestic Royalties) (2 ER 83 at ¶40),

causation (the serving of the termination notices by Defendants which

would cause the Foundation to lose those Domestic Royalties) (*id*.), and a

remedy that would address these wrongs (the prevention of the

terminations from taking effect) (2 ER 84 at ¶43).  Thus, the Foundation has

satisfied the threshold inquiry for Article III standing in federal court.

---

[6]  However, a court relaxes its inquiries regarding redressability and
immediacy where Congress has by statute "accorded [a litigant] a
procedural right to protect his concrete interests."  *Id*. at 572, n. 7.

## III. THE FOUNDATION HAS STANDING UNDER THE COPYRIGHT ACT AND THE DISTRICT COURT'S RULING TO THE CONTRARY WAS IN ERROR

### A. The Foundation Has Standing Under the Copyright Act to Challenge Defendants' Notices of Termination

As mentioned above, the 1976 Act is silent on the issue of who may challenge a termination notice. However, the Foundation's standing as a beneficial owner of copyright to challenge these notices is implicit in Section 501(b) and explicit in C.F.R. § 201.10(f)(6), a regulation enacted by the Register of Copyrights pursuant to Sections 203 and 304. The Register of Copyright's interpretation of Sections 203 and 304 in that regulation is entitled to judicial deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). *See also Marascalco*, 953 F.2d at 473 (deferring to the interpretation of the Register of Copyrights).

#### 1. The Foundation Has Alleged Beneficial Ownership of The Copyrights At Issue

By alleging that Ray Charles wrote the songs at issue, that Mr. Charles assigned the copyrights in those compositions pursuant to the Songwriter Contracts in exchange for the right to receive royalties, and that the Foundation is the legal heir and successor-in-interest to Ray Charles, the Foundation adequately alleged that it is the beneficial owner of all

27

copyrights at issue in this action. (2 ER 71-72, 80, 83, 86 at ¶¶5, 33, 40, 49,

50.)[7] Section 501(b) is the sole standing provision of the 1976 Act, and

confers standing to sue for infringement on the beneficial owner of a

copyright. *See Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir.

1996) (discussing Congress' intent in Section 501(b) "to allow every

beneficial owner to protect his interests, just in case the legal owner is not

doing so . . . . because an infringer may well injure those who have rights to

royalties . . . ."). The legislative history of the 1976 Act states: "A 'beneficial

owner' for this purpose would include, for example, an author who had

parted with legal title to the copyright in exchange for percentage royalties

based on sales or license fees." H.R. Rep. No. 1476, 94th Cong., 2d Sess.

159, *reprinted in* 1976 U.S. Code Cong. & Ad. News 5659 at 5775; *see Silvers,*

402 F.3d at 885-86; *see also Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984).

Thus, during his lifetime, Ray Charles was the beneficial owner of the

copyrights at issue pursuant to his agreements with Progressive.

---

[7] In the Complaint, the Foundation was permitted by law to plead in the alternative that either (a) the copyrights at issue were works-for-hire, or (b) that the Foundation is the beneficial owner of those copyrights. S*ee PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 858-59 (9th Cir. 2007) (allowing for pleading in the alternative).

Upon Mr. Charles' death, and pursuant to his estate plans, the

Foundation became Mr. Charles' successor-in-interest and the beneficial

owner of the copyrights at issue.  (2 ER 71-72, 80, 83, 86 at ¶¶5, 33, 40, 49,

50.) As a beneficial owner of those copyrights, the Foundation has standing

under Section 501(b) to vindicate its rights by maintaining a suit for

infringement.  The Foundation should also have standing to challenge the

terminations of the very agreements from which it derives its beneficial

ownership.

### 2. 17 U.S.C. Section 501 is the Sole Standing Provision of the 1976 Copyright Act and Confers Standing on The Foundation to Maintain an Action for Infringement

As discussed above, the sole standing provision in the 1976 Act is

Section 501.  Section 501(b) expressly confers standing on the Foundation,

as a beneficial owner, to pursue a copyright infringement claim *on exactly*

*the same songs and pursuant to the very agreements* that are the subject of

Defendants' termination notices.  As numerous courts have recognized, in

conferring standing on beneficial owners in Section 501(b) of the 1976 Act,

Congress "'merely codified the case law that had developed under the 1909

Copyright Act with respect to the beneficial owner's standing to sue.'"

*Moran v. London Records, Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987) (discussing a

beneficial owner's "standing to sue under the 1909 Act.") *quoting Cortner*, 732 F.2d at 271.  That case law plainly conferred standing on beneficial owners to file suit under the 1909 Act.  *See Ted Browne Music Co. v. Fowler*, 290 F. 751, 753-54 (2d Cir. 1923) (holding that a beneficial owner has standing to sue for infringement under the 1909 Act); *see also Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978) (holding that a beneficial owner has standing to sue for infringement under the 1909 Act); *see also Manning v. Miller Music Corp.*, 174 F. Supp. 192, 194 (S.D.N.Y. 1959) (discussing a beneficial owner's standing to seek injunctive relief under the 1909 Act).

In fact, the very concept of beneficial or equitable ownership of a copyright was created over 90 years ago to confer standing under the 1909 Act on an author (or his or her successor-in-interest) who had parted with legal title.  Courts derived this principle of equitable standing from trust law, and used it to confer (rather than deny) standing where, for example, the legal owner "held [the copyright] in trust for the author."  *Schellberg v. Empringham*, 36 F.2d 991, 991, 994 (S.D.N.Y. 1929).  In codifying the above-referenced case law, the 1976 Act, "provides that the 'legal or beneficial owner of an exclusive right' has standing to sue.  Apparently, this means that either may sue, without any grant of priority to the legal owner."  3

Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 12.02[D] (2012).

### 3. The Regulation Enacted By the Register of Copyrights at 37 C.F.R. §201.10(f)(6) Is Controlling and Confers Standing on the Foundation As a Beneficial Owner

As discussed above, the sole standing provision of the 1976 Act is Section 501. Sections 203 and 304 are silent with respect to standing to challenge a termination notice. (1 ER 60 (finding that Sections 203 and 304 "do not define who may challenge termination notices. . .").) However, in light of the numerous cases filed by either the party seeking to terminate or the grantee, redress under the termination provisions is available. *See, e.g., Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1041 (9th Cir. 2005) *cert. denied,* 548 U.S. 904 (2006) (statutory heir filing declaratory relief action under termination provision); *see also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 981 (9th Cir. 2008) (grantee filing declaratory relief action under termination provision).

When faced with Congressional silence regarding an issue arising from a federal statute, courts are required to defer to the interpretation of that statute by the agency responsible for its administration. Section 701 of the 1976 Act provides, "All administrative functions and duties under this

title, except as otherwise specified, are the responsibility of the Register of Copyrights as director of the Copyright Office of the Library of Congress." *See also* 17 U.S.C. § 702. Moreover, Sections 203(a)(4)(B) and 304(c)(4) specifically direct the Register to promulgate regulations to effectuate the termination provisions of Sections 203 and 304. Where Congress is silent and an administrative agency has addressed that silence, the United States Supreme Court has repeatedly mandated that courts must defer to the responsible agency's interpretation of that statute.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a

32

>reasonable interpretation made by the
>administrator of an agency.

*Chevron*, 467 U.S. at 842-44; *see also Alaska v. Babbitt*, 72 F.3d 698, 702 (9th

Cir. 1995) *cert. denied,* 517 U.S. 1187 (1996) ("Lacking clear direction [from

Congress or its legislative history], we must decide whether the federal

agencies' conclusion . . . is based on a permissible construction of the

statute."). "Such legislative regulations are given controlling weight unless

they are arbitrary, capricious, or manifestly contrary to the statute."

*Chevron*, 467 U.S. at 844; *see also City of Arlington v. FCC*, 569 U.S. ___, 133 S.

Ct. 1863, 1868 (2013).

Furthermore, this Court has specifically recognized that regulations

enacted by the Register of Copyrights are entitled to judicial deference.

*Marascalco*, 953 F.2d at 473 *citing Cablevision Sys. Dev. Co. v. Motion Picture

Ass'n of Am., Inc.*, 836 F.2d 599, 609-610 (D.C. Cir. 1988) (stating in reference

to the Register of Copyrights that "The Court . . . ordinarily give[s] weight

to the interpretation of an ambiguous statement by the agency charged

with its administration.").[8]

---

[8] In doing so, this Court has implicitly recognized that the Register of
Copyright's regulations are afforded greater deference than an
administrative agency's factual findings and conclusions. *See Skidmore v.*

As set forth above, the 1976 Act is silent as to which parties have standing to challenge a termination notice. In fact, the district court expressly recognized that Sections 203 and 304, the sole provisions of the 1976 Act that address termination rights, are silent as to standing. (1 ER 60 ("Those sections do not define who may challenge termination notices . . . .").) Because the 1976 Act is silent as to standing to challenge a termination notice, this Court should defer to the interpretation of the Act found in the regulations enacted by the Register of Copyrights. *See Chevron*, 467 U.S. at 842-44; *see also Marascalco*, 953 F.2d at 473. This administrative deference applies *a fortiori* in this case, where Congress specifically mandated that the Register enact regulations to effectuate the termination of transfer provisions of the 1976 Act. [9]

---

*Swift & Co.*, 323 U.S. 134, 140 (1944). In *Skidmore*, the Supreme Court held that courts should defer to the factual findings and conclusions of an administrative agency only after considering "the validity of [the agency's] reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id*. at 140.

[9] In light of Congress's silence as to which parties have standing to challenge termination notices, the Court should conclude that Congress intended "that the ambiguity would be resolved, first and foremost, by the [Register], and desired the [Register] (rather than the courts), to possess whatever degree of discretion that ambiguity allows." *City of Arlington*, 133 S. Ct. at 1868 (internal citations and quotation marks omitted); s*ee also* 17 U.S.C. §§203(a)(4), 304(c)(4), 701, 702.

Sections 304(c)(4) and 203(a)(4) require recordation of termination notices with the Copyright Office.  Those provisions require the Register of Copyrights to prescribe the form and manner of how recordation should occur, and the effect thereof.  The Register has adhered to its obligations by promulgating 37 C.F.R. § 201.10 ("§ 201.10").

§ 201.10, entitled "Notices of termination of transfers and licenses," delineates the contents and procedures required for a termination notice to take effect.  Throughout the regulation, the Register refers to the "author" and "grantee" as the parties to the termination process.  However, when explaining who may challenge a termination notice, the Register expressly states in § 201.10(f)(6) that "*any party* claiming that the legal and formal requirements for issuing a valid notice [of termination] have not been met" may challenge that notice "including before a court of competent jurisdiction."  (Emphasis added.)

The Register's use of the term "any party" in this provision stands in stark contrast to the references to "author" and "grantee" in the balance of the regulation.  *See, e.g.*, 37 C.F.R. §§ 201.10(b)(1)(ii), (b)(2)(ii), (d)(1), (d)(2)(i), (d)(2)(ii).  By using the words "any party" rather than "grantee," the Register is explicitly not limiting such challenges to "grantees."  Rather,

the Register is explicitly providing that such challenge may be made by

"any party," such as the Foundation.

The term "any party" means just that, and plainly includes a

beneficial owner of a copyright.  *See* 17 U.S.C. § 501(b).  As set forth above,

the sole standing provision of the 1976 Act, Section 501, expressly confers

standing on "the legal or *beneficial owner* of an exclusive right under a

copyright . . . ." to bring suit for infringement.  17 U.S.C. § 501(b) (emphasis

added).  A beneficial owner has standing to file suit for infringement under

Section 501(b) of the 1976 Act, and is therefore included in the term "any

party" under § 201.10(f)(6).[10]  Because the regulations enacted pursuant to

the congressional mandate contained within the *termination provisions*

*themselves* explicitly state that "any party" can challenge the legal and

---

[10] The language "any party" also bears a striking similarity to the language
"any party aggrieved" in Section 36 of the 1909 Act, formerly 17 U.S.C.
§112.  Section 36 of the 1909 Act allowed "any party aggrieved" to bring a
claim for injunctive relief.  Courts interpreted "any party aggrieved" to
confer standing on any party that had the right to maintain a suit for
infringement under the 1909 Act, including a beneficial owner of copyright.
*See Manning*, 174 F. Supp. at 194 *cited with approval in Pye*, 574 F.2d at 480.
In light of Congress's intent to "'codif[y] the case law that had developed
under the 1909 Copyright Act with respect to the beneficial owner's
standing to sue,'" the Register's reference to "any party" is likely intended
to carry this case law conferring standing on beneficial owners forward to
the termination provisions of the 1976 Act.  *See Moran*, 827 F.2d at 183
(discussing a beneficial owner's "standing to sue under the 1909 Act.")
*quoting Cortner*, 732 F.2d at 271.

formal foundations of termination notices, the Foundation facially has standing.

§ 201.10(f)(6) is entitled to judicial deference because it is based on a permissible construction of the 1976 Act and reflects a reasonable reading of that statute. *See Chevron*, 467 U.S. at 842-44; *see also Marascalco*, 953 F.2d at 473. As part of the 1976 Act, Congress concurrently enacted both the standing requirement in Section 501(b) and the termination of transfer provisions in Sections 203 and 304. As set forth in Section III. A. 2, *supra*, Section 501(b) was inarguably intended to codify over 90 years of precedent granting beneficial owners standing to sue under the Copyright Act. The Register's interpretation merely applies that Congressional intent to the termination provisions of Sections 203 and 304. § 201.10(f)(6) recognizes that Congress did not intend to confer standing on a beneficial owner to bring suit for infringement, but deny that same beneficial owner standing to challenge the outright termination of its ownership interests. Accordingly, the Court should defer to the Register's interpretation in §

201.10(f)(6) and hold that the Foundation has standing to challenge Defendants' termination notices. [11]

The district court erred in rejecting the Register's "passing reference to 'any party'" in § 201.10 (f)(6) without first applying the "deferential standard of review" mandated in *Chevron* and its progeny. (1 ER 62 at n. 13); *see City of Arlington*, 133 S.Ct. at 1868; *see also Marascalco*, 953 F.2d at 473. Once the district court concluded that Sections 203 and 304 "do not define who may challenge termination notices," (1 ER 60), the court was obligated to give the Register's interpretation of the 1976 Act in § 201.10 (f)(6) "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844; *see also Marascalco*, 953 F.2d at 473. Instead, the district court did precisely what the Supreme Court has repeatedly cautioned against: it "substitute[d] its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 842-43. The

---

[11] The Foundation is attempting to do exactly what is contemplated by §201.10(f)(6): it is claiming that Defendants' notices do not meet the "legal requirements" of the 1976 Act by operation of the 1980 Agreement, nor do they meet the "formal requirements" because of Defendant multiple termination notices for the same songs and incorrect calculation of time relating to the unpublished songs.

district court's failure to apply the analysis mandated by both the United States Supreme Court in *Chevron* and this Court in *Marascalco* is reason enough for this Court to reverse the district court's dismissal of the Foundation's claim for declaratory relief for lack of standing.

> **4.** **The Overall Context and Policy of The 1976 Act Strongly Favor Conferring Standing on Beneficial Owners to Challenge Termination Notices**

The Foundation's standing is further supported by the overall context and policy of the 1976 Act. Where the text of a particular section of a statute is silent or ambiguous, courts resolve statutory omissions or ambiguities by reviewing the statute as a whole. When "the text [of a law] is ambiguous . . . we then seek guidance from legislative history and from the [law's] overall structure." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989) superceded on other grounds at Fed. R. Evid. 609 (addressing the Federal Rules of Evidence).

> Statutory construction … is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); *see also U.S. v. Boisdore's Heirs*, 49 U.S. (8 How.) 113, 122 (1850) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.").

Furthermore, when interpreting statutes, courts infer that Congress uses terms in accordance with their common law meaning. "Where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989) (internal citations and quotation marks omitted) (interpreting 17 U.S.C. § 101(1) of the 1976 Act) *quoting NLRB v. Amax Coal Co.*, 453 U. S. 322, 329 (1981). Similarly, "where a common law principle is well-established . . .the courts may take it as a given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotations omitted) *quoting Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952).

Denying standing to a beneficial owner to challenge a notice of termination would contravene both the intent of Congress in enacting Section 501(b) and the accepted common law meaning of beneficial ownership under the 1909 Act. *See Reid*, 490 U.S. at 739; *see also Solimino*, 501 U.S. at 108. As set forth in section III.A.2., *supra*, courts have repeatedly recognized that Section 501(b) "merely codified the case law that had developed under the 1909 Copyright Act with respect to the beneficial owner's standing to sue." *Moran*, 827 F.2d at 183 (internal citations and quotation marks omitted). That case law plainly conferred standing on beneficial owners to file suit under the 1909 Act. *See Pye*, 574 F.2d at 480 (holding that a beneficial owner has standing to file suit for infringement under the 1909 Act); *see also Manning*, 174 F. Supp. at 194 (discussing a beneficial owner's standing to seek injunctive relief under the 1909 Act).

It would be a paradox to argue that in codifying the concept of beneficial ownership in the 1976 Act - a concept created to confer standing on an author and his successors-in-interest - Congress intended *sub silentio* to deny a beneficial owner standing to challenge termination notices under Sections 203 and 304. *See Burns v. U.S.*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited

41

when it is contrary to all other textual and contextual evidence of congressional intent."); *see also Briscoe v. LaHue*, 460 U.S. 325, 362 (1983) ("To assume that Congress, which had enacted a criminal sanction directed against state judicial officials, intended *sub silentio* to exempt those same officials from the civil counterpart [in the same statute] approaches the incredible."). Instead, by referring to a "beneficial owner" in Section 501(b), Congress legislated with an expectation that beneficial owners would have standing under the entire 1976 Act. *See Solimino*, 501 U.S. at 104; *see also Moran*, 827 F.2d at 183. Once again, this principle is recognized by the Register's reference to "any party" in § 201.10 (f)(6), discussed in section III.A.3., *supra*.

The district court's conclusion that "by including beneficial owners in § 501(b) but omitting them from §§ 304(c) and 203, Congress must have intended to exclude them from the termination sections" has no basis in the plain language of the 1976 Act, in the legislative history of that Act, or in the common law meaning of beneficial ownership under the 1909 Act. (ECF No. 41 at 24); *see Marascalco*, 953 F.2d at 472-73 (finding that a Judge's interpretation of a provision of the Copyright Act was "less authoritative in our view because it makes no reference . . . to the legislative history of

[that] provision."). Instead, this reading of the statute disregards the Register's interpretation of Sections 203 and 304, Congress' intent in enacting Section 501(b), and well-established law under the 1909 Act, all of which strongly favor a beneficial owner's standing.

A beneficial owner of copyright is entitled to a court's determination of both (a) whether a statutory heir's termination notices are valid, and, if so, (b) the time at which a statutory heir's rights take effect, thereby terminating the beneficial owner's rights. A beneficial owner's need for a declaration of when it loses its rights is particularly necessary in cases such as this one where Defendants served multiple termination notices for a single composition. If Defendants' termination notices are valid, and they are not, the Foundation requires a determination of which of Defendants' duplicative notices are valid and when those terminations will take effect, thereby cutting-off the Foundation's rights and revenues.

There are other factual scenarios not present in this case that justify a beneficial owner's standing to challenge a termination notice. For example, a beneficial owner should have standing to vindicate its rights in cases where a false statutory heir files a termination notice. Consider the case where a termination notice is filed by a purported widow or child of an

author who was unmarried and had no known children.  *See* 17 U.S.C. §

203(a)(2).  Another example is where a notice of termination is filed by less

than the required majority of the author's statutory heirs.  *See* 17 U.S.C. §

203(a)(1).

In both of these cases, the legal copyright owner might not take any

action either because it overlooked the termination notices or does not care

about its continued ownership of the copyrights.  Alternatively, the

copyright transferee/owner might be persuaded to not challenge an

improper notice of termination in exchange for paying the purported

statutory heirs a royalty that is less than the royalty then being paid to the

beneficial owner.  In this scenario, the legal owner achieves a financial win-

win: it (a) saves the substantial legal fees and costs to be incurred in

challenging the erroneous notice of termination, and (b) keeps a greater

share of the profits derived from the copyright.  This prospective financial

gain becomes exponentially greater where the legal owner owns a library

of copyrights, and is faced with the prospect of challenging dozens if not

hundreds of termination notices in the coming years.  While the legal

owner stands to gain under this scenario, the beneficial owner loses at least

a portion of its copyright ownership and the resulting royalties without the ability to challenge the improper termination notice.

As a matter of policy and practicality, it would be incongruous for the Foundation as a beneficial copyright owner to have standing to sue for copyright infringement, yet lack standing to prevent the termination of the very transfers that convey to the Foundation its beneficial ownership.

### B. The District Court Erred in Finding that the Foundation Is Not Within the Zone of Interests of Sections 203 and 304

The district court erred in concluding that the Foundation lacks prudential standing because it is not within the zone of interests of Sections 203 and 304. As a threshold matter, because the Foundation unquestionably has Article III standing, as discussed in section II., *supra*, the "zone of interests" inquiry is moot. As the Foundation argued before the district court, the question of prudential standing comes into play only "[w]here it is arguable whether a plaintiff has suffered a sufficient injury to satisfy Article III." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004). Here, the district court concluded that the Foundation did suffer an injury sufficient to satisfy Article III – the loss of its royalties by virtue of Defendants' termination notices pursuant to Sections 203 and 304. (1 ER

45

59.)  Nevertheless, the district court conducted a "zone of interests"

analysis.  This alone is reversible error.

Furthermore, the zone of interests analysis is traditionally invoked

where a party asserts a constitutional claim or challenges an agency

regulation, not where a plaintiff challenges the actions of private parties

that have or will cause plaintiff monetary damage.  *See, e.g., Baker*, 369 U.S.

at 204 (finding that voters who alleged facts showing disadvantage to

themselves "had alleged such a personal stake in the outcome of the

controversy" to assert a Fourteenth Amendment challenge to a Tennessee

state staute)*; see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust*,

522 U.S. 479, 488 (1998) (holding that a bank had standing under the § 10(a)

of the APA to challenge the National Credit Union Administrator's

relaxation of statutory restrictions on the activities of its competitors)

*superseded on other grounds at* 12 U.S.C. § 1759.  Here, the Foundation is the

beneficial owner of the copyrights at issue and unquestionably has or will

suffer an injury in fact.  The Foundation has not asserted a claim such as a

constitutional or regulatory challenge that mandates a zone of interests

analysis.

46

Additionally, in the 1976 Act, Congress abrogated the prudential standing requirement as it applies to beneficial owners. As discussed in section III.A.2., *supra*, Section 501(b) of the 1976 Act codified case law that had developed under the 1909 Copyright Act with respect to a beneficial owner's standing to sue. *See Moran*, 827 F.2d at 183; *see also Yount*, 101 F.3d at 834. In doing so, Congress negated the zone of interests test with respect to beneficial owners. *See Bennett v. Spear*, 520 U.S. 154, 164 (1997) (holding that Congress negated the zone of interests test in enacting the Endangered Species Act). Alternatively, the above-referenced precedent already resolved this issue in concluding that a beneficial owner is arguably within the zone of interests to be protected by the Copyright Act.[12] *Nat'l Credit Union Admin.*, 522 U.S. at 492; *see Manning*, 174 F. Supp. at 194 (concluding that a beneficial owner has standing to bring a claim for injunctive relief under the 1909 Act).

---

[12] In light of this precedent, Section 501(b) also establishes that the Foundation, as a beneficial owner, is a real party in interest and not asserting the rights of a third party. *See* 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright §12.02[D] (2012) ("[Section 501(b)] provides that the 'legal or beneficial owner of an exclusive right' has standing to sue. Apparently, this means that either may sue, without any grant of priority to the legal owner.").

The district court's conclusion that the Foundation was not within the zone of interests was based solely on an unsupported inference that "[b]ecause Congress took care to include beneficial owners in § 501(b), it must have also purposefully excluded beneficial owners from §§ 304(c) and 203." (1 ER 62.) Leaving aside that Sections 203 and 304 do not confer standing on any party, as discussed in section III.A.3., *supra*, the district court reached this conclusion only after improperly and summarily rejecting the Register's interpretation of these provisions in § 201.10(f)(6), which is entitled to judicial deference. (*See id*. at n.13); *see also Chevron*, 467 U.S. at 842-44; *see also Marascalco*, 953 F.2d at 473. The district court's conclusion also disregards that the zone of interest test is "not meant to be especially demanding," and that "[p]rudential standing is satisfied unless the party's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1059 (9th Cir. 2004) (internal citations and quotation marks omitted). For all of the above-referenced reasons, the district court erred in

48

concluding that the Foundation is not within the zone of interests protected by Sections 203 and 304.

Finally, even if the district court properly concluded that a beneficial owner of copyright is not within the zone of interests of Sections 203 and 304, the Foundation is nevertheless contemplated by those provisions. While Sections 203 and 304 do not explicitly reference beneficial owners, those provisions do identify an "author's executor, administrator, personal representative or trustee" as statutory heirs. 17 U.S.C. §§ 203(a)(2)(d), 304(c)(2)(d). Black's Law Dictionary defines "personal representative" as a sub-species of "representative" and, in that definition, incorporates by reference the definitions of "legal representative" and "lawful representative." *See FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (looking to Black's Law Dictionary to determine the meaning of the word "cognizable" in the Federal Torts Claims Act). Black's Law defines "lawful representative" as "a legal heir."

As alleged in the Complaint, the Foundation is the legal heir to Ray Charles. (2 ER 71-72, 80, 83 at ¶¶5, 33, 40.) As such, the Foundation has adequately alleged that it is both the beneficial owner of Mr. Charles' copyrights and the "personal representative" of Mr. Charles. Furthermore,

49

the Foundation is the recipient of a grant by will, and is therefore

contemplated by the plain language of Sections 203 and 304.  *See* 17 U.S.C.

§§ 203(a), 304(c).  As a result, the Foundation is a statutory heir and has

standing under Sections 203 and 304 to challenge a notice of termination

filed by another statutory heir.

## IV.   THE DISTRICT COURT ERRED BY FAILING TO GRANT THE FOUNDATION LEAVE TO AMEND

The district court erred in refusing to grant the Foundation leave to

amend on the grounds that any amendment would be futile.  (1 ER 65.)

Generally, a court "should freely give leave [to amend] when justice so

requires."  Fed. R. Civ. P. 15.  The Supreme Court has held that a court

should grant leave to amend unless it finds "undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendment previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment, [or] futility of the

amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Absent prejudice or

a "strong showing" of the *Foman* factors, "there exists a *presumption* under

Rule 15 (a) in favor of granting leave to amend."  *Eminence Capital, LLC v.

Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  As a general rule, dismissal

without leave to amend is improper "unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (internal citations omitted); *see also U.S. v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011).

The district court should have granted the Foundation leave to amend to address any deficiencies identified by the court in its order on the motion to dismiss. (1 ER 65.) For example, as set forth in III.B., *supra*, the Foundation could have amended its complaint to allege that it is the personal representative of Ray Charles. 17 U.S.C. §§ 203(a)(2)(d), 304(c)(2)(d). This amendment would have conferred standing on the Foundation even under the district court's improper reading of Sections 203 and 304. Accordingly, even if the Court otherwise affirms the district court's ruling, and it should not, the Court should reverse the district court's ruling denying the Foundation leave to amend. (1 ER 65.)

## CONCLUSION

This Court should hold that The Ray Charles Foundation has standing to pursue its first cause of action for declaratory and injunctive

relief.  Accordingly, the Judgment should be vacated and the case

remanded to the district court.

                                        Respectfully submitted,

September 18, 2013          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

                                By:  _/s/_  *Yakub Hazzard*

                                Yakub Hazzard
                                Daniel G. Stone
                                ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                2049 Century Park East, #3400
                                Los Angeles, CA 90067-3208
                                Telephone:  310-552-0130
                                Facsimile:  310-229-5800

## STATEMENT OF RELATED CASES

The Foundation knows of no related cases within the meaning of

Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,864 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 Book Antigua 14 point font.

_/s/    Yakub Hazzard_

Yakub Hazzard
Daniel G. Stone
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Attorneys for Plaintiff-Appellant
The Ray Charles Foundation

September 18, 2013

# ADDENDUM

Circuit Rule 28-2.7

17 U.S.C. Sections 102, 203, 302, 304, 501, 701, and 702

The Copyright Act of March 4, 1909

Federal Rules of Civil Procedure 12 and 15

37 Code of Federal Regulations Section 201.10

Excerpts from House Report No. 94-1476

Excerpts from Black's Law Dictionary

60705416.1

In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment—

(A) shall be considered or otherwise given any legal significance, or

(B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination,

by the courts or the Copyright Office. Paragraph (2) shall be interpreted as if both section 2(a)(1) of the Work Made for Hire and Copyright Corrections Act of 2000 and section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, were never enacted, and without regard to any inaction or awareness by the Congress at any time of any judicial determinations.[26]

The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.[27]

## §102 · Subject matter of copyright: In general[28]

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

## §203 · Termination of transfers and licenses granted by the author[3]

(a) Conditions for Termination.—In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution

of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

(4) The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(b) EFFECT OF TERMINATION. — Upon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author, authors, and other persons owning termination interests under clauses (1) and (2) of subsection (a), including those owners who did not join in signing the notice of termination under clause (4) of subsection (a), but with the following limitations:

(1) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(2) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of subsection (a). The rights vest in the author, authors, and other persons named in, and in the proportionate shares provided by, clauses (1) and (2) of subsection (a).

(3) Subject to the provisions of clause (4) of this subsection, a further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under clause (2) of this subsection, as are required to terminate the grant under clauses (1) and (2) of subsection (a). Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under clause (2) of this subsection, including those who did not join in signing it. If any person dies after rights under a

terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this clause.

(4) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the persons provided by clause (3) of this subsection and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of subsection (a).

(5) Termination of a grant under this section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(6) Unless and until termination is effected under this section, the grant, if it does not provide otherwise, continues in effect for the term of copyright provided by this title.

## §204 · Execution of transfers of copyright ownership

(a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

(b) A certificate of acknowledgment is not required for the validity of a transfer, but is prima facie evidence of the execution of the transfer if—

(1) in the case of a transfer executed in the United States, the certificate is issued by a person authorized to administer oaths within the United States; or

(2) in the case of a transfer executed in a foreign country, the certificate is issued by a diplomatic or consular officer of the United States, or by a person authorized to administer oaths whose authority is proved by a certificate of such an officer.

## §205 · Recordation of transfers and other documents[4]

(a) CONDITIONS FOR RECORDATION. — Any transfer of copyright ownership or other document pertaining to a copyright may be recorded in the Copyright Office if the document filed for recordation bears the actual signature of the person who executed it, or if it is accompanied by a sworn or official certification that it is a true copy of the original, signed document. A sworn or official certification may be submitted to the Copyright Office electronically, pursuant to regulations established by the Register of Copyrights.

(2) Nothing in paragraph (1) annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(A) any cause of action from undertakings commenced before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990;

(B) activities violating legal or equitable rights that are not equivalent to any of the rights conferred by section 106A with respect to works of visual art; or

(C) activities violating legal or equitable rights which extend beyond the life of the author.

## §302 · Duration of copyright: Works created on or after January 1, 1978[4]

(a) IN GENERAL.—Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death.

(b) JOINT WORKS.—In the case of a joint work prepared by two or more authors who did not work for hire, the copyright endures for a term consisting of the life of the last surviving author and 70 years after such last surviving author's death.

(c) ANONYMOUS WORKS, PSEUDONYMOUS WORKS, AND WORKS MADE FOR HIRE.—In the case of an anonymous work, a pseudonymous work, or a work made for hire, the copyright endures for a term of 95 years from the year of its first publication, or a term of 120 years from the year of its creation, whichever expires first. If, before the end of such term, the identity of one or more of the authors of an anonymous or pseudonymous work is revealed in the records of a registration made for that work under subsections (a) or (d) of section 408, or in the records provided by this subsection, the copyright in the work endures for the term specified by subsection (a) or (b), based on the life of the author or authors whose identity has been revealed. Any person having an interest in the copyright in an anonymous or pseudonymous work may at any time record, in records to be maintained by the Copyright Office for that purpose, a statement identifying one or more authors of the work; the statement shall also identify the person filing it, the nature of that person's interest, the source of the information recorded, and the particular work affected, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation.

(d) RECORDS RELATING TO DEATH OF AUTHORS.—Any person having an interest in a copyright may at any time record in the Copyright Office a statement of the date of death of the author of the copyrighted work, or a statement that the author is still living on a particular date. The statement shall identify the person filing it, the nature of that person's interest, and the source of the

information recorded, and shall comply in form and content with requirements that the Register of Copyrights shall prescribe by regulation. The Register shall maintain current records of information relating to the death of authors of copyrighted works, based on such recorded statements and, to the extent the Register considers practicable, on data contained in any of the records of the Copyright Office or in other reference sources.

(e) Presumption as to Author's Death. — After a period of 95 years from the year of first publication of a work, or a period of 120 years from the year of its creation, whichever expires first, any person who obtains from the Copyright Office a certified report that the records provided by subsection (d) disclose nothing to indicate that the author of the work is living, or died less than 70 years before, is entitled to the benefit of a presumption that the author has been dead for at least 70 years. Reliance in good faith upon this presumption shall be a complete defense to any action for infringement under this title.

### §303 · Duration of copyright: Works created but not published or copyrighted before January 1, 1978[5]

(a) Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such a work expire before December 31, 2002; and, if the work is published on or before December 31, 2002, the term of copyright shall not expire before December 31, 2047.

(b) The distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of any musical work, dramatic work, or literary work embodied therein.

### §304 · Duration of copyright: Subsisting copyrights[6]

(a) Copyrights in Their First Term on January 1, 1978. —

(1)(A) Any copyright, in the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

(B) In the case of—

(i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

(ii) any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire,

the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

(C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

(i) the author of such work, if the author is still living,

(ii) the widow, widower, or children of the author, if the author is not living,

(iii) the author's executors, if such author, widow, widower, or children are not living, or

(iv) the author's next of kin, in the absence of a will of the author,

shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

(2)(A) At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

(B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

(3)(A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

(i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

(B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

(4)(A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.

(B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

(b) Copyrights in Their Renewal Term at the Time of the Effective Date of the Sonny Bono Copyright Term Extension Act[7]—Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.[8]

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.—In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the

authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grand-children are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons

provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) TERMINATION RIGHTS PROVIDED IN SUBSECTION (C) WHICH HAVE EXPIRED ON OR BEFORE THE EFFECTIVE DATE OF THE SONNY BONO COPY-RIGHT TERM EXTENSION ACT.—In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act[9] for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c) (1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.

## §305 · Duration of copyright: Terminal date

All terms of copyright provided by sections 302 through 304 run to the end of the calendar year in which they would otherwise expire.

## Chapter 3 · Notes

1. Private Law 92-60, 85 Stat. 857, effective December 15, 1971, states that:

[A]ny provision of law to the contrary notwithstanding, copyright is hereby granted to the trustees under the will of Mary Baker Eddy, their successors, and assigns, in the work "Science and Health with Key to the Scriptures" (entitled also in some editions "Science and Health" or "Science and Health; with a Key to the Scriptures"), by Mary Baker Eddy, including

## § 501 · Infringement of copyright[3]

(a) Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a), or who imports copies or phonorecords into the United States in violation of section 602, is an infringer of the copyright or right of the author, as the case may be. For purposes of this chapter (other than section 506), any reference to copyright shall be deemed to include the rights conferred by section 106A(a). As used in this subsection, the term "anyone" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

(b) The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it. The court may require such owner to serve written notice of the action with a copy of the complaint upon any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright, and shall require that such notice be served upon any person whose interest is likely to be affected by a decision in the case. The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright.

(c) For any secondary transmission by a cable system that embodies a performance or a display of a work which is actionable as an act of infringement under subsection (c) of section 111, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that television station.

(d) For any secondary transmission by a cable system that is actionable as an act of infringement pursuant to section 111(c)(3), the following shall have standing to sue: (i) the primary transmitter whose transmission has been altered by the cable system; and (ii) any broadcast station within whose local service area the secondary transmission occurs.

(e) With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 119(a)(5), a network station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local service area of that station.

(f)(1) With respect to any secondary transmission that is made by a satellite carrier of a performance or display of a work embodied in a primary transmission and is actionable as an act of infringement under section 122, a television broadcast station holding a copyright or other license to transmit or perform the same version of that work shall, for purposes of subsection (b) of this section, be treated as a legal or beneficial owner if such secondary transmission occurs within the local market of that station.

(2) A television broadcast station may file a civil action against any satellite carrier that has refused to carry television broadcast signals, as required under section 122(a)(2), to enforce that television broadcast station's rights under section 338(a) of the Communications Act of 1934.

## §502 · Remedies for infringement: Injunctions

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

## §503 · Remedies for infringement: Impounding and disposition of infringing articles[4]

(a)(1) At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable—

(A) of all copies or phonorecords claimed to have been made or used in violation of the exclusive right of the copyright owner;

(B) of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies or phonorecords may be reproduced; and

(C) of records documenting the manufacture, sale, or receipt of things involved in any such violation, provided that any records seized under this subparagraph shall be taken into the custody of the court.

### § 701 · The Copyright Office:
### General responsibilities and organization[2]

(a) All administrative functions and duties under this title, except as otherwise specified, are the responsibility of the Register of Copyrights as director of the Copyright Office of the Library of Congress. The Register of Copyrights, together with the subordinate officers and employees of the Copyright Office, shall be appointed by the Librarian of Congress, and shall act under the Librarian's general direction and supervision.

(b) In addition to the functions and duties set out elsewhere in this chapter, the Register of Copyrights shall perform the following functions:

(1) Advise Congress on national and international issues relating to copyright, other matters arising under this title, and related matters.

(2) Provide information and assistance to Federal departments and agencies and the Judiciary on national and international issues relating to copyright, other matters arising under this title, and related matters.

(3) Participate in meetings of international intergovernmental organizations and meetings with foreign government officials relating to copyright, other matters arising under this title, and related matters, including as a member of United States delegations as authorized by the appropriate Executive branch authority.

(4) Conduct studies and programs regarding copyright, other matters arising under this title, and related matters, the administration of the Copyright Office, or any function vested in the Copyright Office by law, including educational programs conducted cooperatively with foreign intellectual property offices and international intergovernmental organizations.

(5) Perform such other functions as Congress may direct, or as may be appropriate in furtherance of the functions and duties specifically set forth in this title.

(c) The Register of Copyrights shall adopt a seal to be used on and after January 1, 1978, to authenticate all certified documents issued by the Copyright Office.

(d) The Register of Copyrights shall make an annual report to the Librarian of Congress of the work and accomplishments of the Copyright Office during the previous fiscal year. The annual report of the Register of Copyrights shall be published separately and as a part of the annual report of the Librarian of Congress.

(e) Except as provided by section 706(b) and the regulations issued thereunder, all actions taken by the Register of Copyrights under this title are subject to the provisions of the Administrative Procedure Act of June 11, 1946, as amended (c. 324, 60 Stat. 237, title 5, United States Code, Chapter 5, Subchapter II and Chapter 7).

(f) The Register of Copyrights shall be compensated at the rate of pay in effect for level III of the Executive Schedule under section 5314 of title 5.[3] The Librarian of Congress shall establish not more than four positions for Associate

Registers of Copyrights, in accordance with the recommendations of the Register of Copyrights. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights. Each Associate Register of Copyrights shall be paid at a rate not to exceed the maximum annual rate of basic pay payable for GS-18 of the General Schedule under section 5332 of title 5.

## §702 · Copyright Office regulations[4]

The Register of Copyrights is authorized to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title. All regulations established by the Register under this title are subject to the approval of the Librarian of Congress.

## §703 · Effective date of actions in Copyright Office

In any case in which time limits are prescribed under this title for the performance of an action in the Copyright Office, and in which the last day of the prescribed period falls on a Saturday, Sunday, holiday, or other nonbusiness day within the District of Columbia or the Federal Government, the action may be taken on the next succeeding business day, and is effective as of the date when the period expired.

## §704 · Retention and disposition of articles deposited in Copyright Office[5]

(a) Upon their deposit in the Copyright Office under sections 407 and 408, all copies, phonorecords, and identifying material, including those deposited in connection with claims that have been refused registration, are the property of the United States Government.

(b) In the case of published works, all copies, phonorecords, and identifying material deposited are available to the Library of Congress for its collections, or for exchange or transfer to any other library. In the case of unpublished works, the Library is entitled, under regulations that the Register of Copyrights shall prescribe, to select any deposits for its collections or for transfer to the National Archives of the United States or to a Federal records center, as defined in section 2901 of title 44.

(c) The Register of Copyrights is authorized, for specific or general categories of works, to make a facsimile reproduction of all or any part of the material deposited under section 408, and to make such reproduction a part of the

# AN ACT TO AMEND AND CONSOLIDATE THE ACTS RESPECTING COPYRIGHT.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person entitled thereto, upon complying with the provisions of this Act, shall have the exclu-
5 sive right:

(a) To print, reprint, publish, copy, and vend the copyrighted work; *Exclusive right to print, publish and vend.*

(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it *Exclusive right to translate, dramatize, arrange and adapt, etc.*
10 be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

15 (c) To deliver or authorize the delivery of the copyrighted work in public for profit if it be a lecture, sermon, address, or similar production; *Exclusive right to deliver lectures, sermons, etc.*

(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and *To represent dramatic works, or make record, or exhibit or perform, etc.*
20 not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented,
25 produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever;

COPYRIGHT LAW OF THE UNITED STATES.

To perform music and make arrangement, setting, or record.

(e) To perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of public performance for profit; and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system 5 of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: *Provided*, That the provisions of this Act, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the 10 musical work, shall include only compositions published and copyrighted after this Act goes into effect, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, 15 convention, agreement, or law, to citizens of the United States similar rights: *And provided further, and as a condition of extending the copyright control to such mechanical reproductions*, That whenever the owner of a musical copyright has used or permitted or knowingly 20 acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of two cents on each such 25 part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the twentieth day of each month on the number of parts of instruments manufactured during the previous month 30 serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the twentieth of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such 35 royalty has been paid from further contribution to the copyright except in case of public performance for profit: *And provided further*, That it shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving 40 to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a

Act not retroactive.

Music by foreign author.

Control of mechanical musical reproduction.

Royalty for use of music on records, etc.

Notice of use of music on records.

License to use music on records.

ACT OF MARCH 4. 1909 (IN EFFECT JULY 1, 1909).

recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.

5   In case of the failure of such manufacturer to pay to <span style="float:right">Failure to pay royalties.</span> the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court 10 may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this Act, not exceeding three times such amount.

  The reproduction or rendition of a musical composition <span style="float:right">Reproduction of music on coin-operated machines.</span> 15 by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs.

  SEC. 2. That nothing in this Act shall be construed to <span style="float:right">Right at common law or in equity.</span> 20 annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor.

  SEC. 3. That the copyright provided by this Act shall <span style="float:right">Component parts of copyrightable work.</span> 25 protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright. The copyright upon <span style="float:right">Composite works or periodicals.</span> composite works or periodicals shall give to the pro- 30 prietor thereof all the rights in respect thereto which he would have if each part were individually copyrighted under this Act.

  SEC. 4. That the works for which copyright may be <span style="float:right">Works protected.</span> secured under this Act shall include all the writings of 35 an author.

  SEC. 5. That the application for registration shall spec- <span style="float:right">Classification of copyright works.</span> ify to which of the following classes the work in which copyright is claimed belongs:

  (a) Books, including composite and cyclopædic works, <span style="float:right">Books, composite, cyclopædic works; directories, gazetteers, etc.</span> 40 directories, gazetteers, and other compilations;

  (b) Periodicals, including newspapers;

COPYRIGHT LAW OF THE UNITED STATES.

(c) Lectures, sermons, addresses, prepared for oral delivery;

(d) Dramatic or dramatico-musical compositions;

(e) Musical compositions;

(f) Maps;                                                                     5

(g) Works of art; models or designs for works of art;

(h) Reproductions of a work of art;

(i) Drawings or plastic works of a scientific or technical character;

(j) Photographs;                                                              10

(k) Prints and pictorial illustrations:

**Classification does not limit copyright.** *Provided, nevertheless,* That the above specifications shall not be held to limit the subject-matter of copyright as defined in section four of this Act, nor shall any error in classification invalidate or impair the copyright protection secured under this Act.   15

**Compilations, abridgments, dramatizations, translations, new editions.** SEC. 6. That compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain, or of copyrighted works when produced with the consent of the proprietor of the copyright in such work, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this Act; but the publication of any such new works shall not affect   20

**Subsisting copyright not affected.** the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.   25

**Not subject-matter of copyright; works in public domain; government publications.** SEC. 7. That no copyright shall subsist in the original text of any work which is in the public domain, or in any work which was published in this country or any foreign country prior to the going into effect of this Act and has not been already copyrighted in the United States, or in any publication of the United States Government, or any reprint, in whole or in part, thereof: *Provided, however,* That the publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgement or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor.   30   35   40

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

SEC. 8. That the author or proprietor of any work made *Copyright to author or proprietor for terms specified in Act.* the subject of copyright by this Act, or his executors, administrators, or assigns, shall have copyright for such work under the conditions and for the terms specified in
5 this Act: *Provided, however,* That the copyright secured by this Act shall extend to the work of an author or proprietor who is a citizen or subject of a foreign state or nation, only: *Foreign authors who may secure copyright protection.*

(a) When an alien author or proprietor shall be domi- *Alien authors domiciled in U. S.*
10 ciled within the United States at the time of the first publication of his work; or

(b) When the foreign state or nation of which such *Authors, when citizens of countries granting reciprocal rights.* author or proprietor is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of
15 the United States the benefit of copyright on substantially the same basis as to its own citizens, or copyright protection substantially equal to the protection secured to such foreign author under this Act or by treaty; or when such foreign state or nation is a party to an international *International agreement.*
20 agreement which provides for reciprocity in the granting of copyright, by the terms of which agreement the United States may, at its pleasure, become a party thereto.

The existence of the reciprocal conditions aforesaid *Presidential proclamation.* shall be determined by the President of the United States,
25 by proclamation made from time to time, as the purposes of this Act may require.

SEC. 9. That any person entitled thereto by this Act *Publication with notice initiates copyright.* may secure copyright for his work by publication thereof with the notice of copyright required by this Act; and
30 such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section twenty-one of this Act.

35 SEC. 10. That such person may obtain registration of *Registration of copyright.* his claim to copyright by complying with the provisions of this Act, including the deposit of copies, and upon such compliance the register of copyrights shall issue to him the certificate provided for in section fifty-five of this Act. *Copyright certificate.*

40 SEC. 11. That copyright may also be had of the works *Copyright protection of unpublished works: lectures, dramas, music, etc.* of an author of which copies are not reproduced for sale, by the deposit, with claim of copyright, of one complete

COPYRIGHT LAW OF THE UNITED STATES.

copy of such work if it be a lecture or similar production
or a dramatic or musical composition; of a photographic
print if the work be a photograph; or of a photograph
or other identifying reproduction thereof if it be a work
of art or a plastic work or drawing.  But the privilege   5
of registration of copyright secured hereunder shall not
exempt the copyright proprietor from the deposit of
copies under sections twelve and thirteen of this Act
where the work is later reproduced in copies for sale.

**Deposit of copies after publication.**

SEC. 12. That after copyright has been secured by pub- 10
lication of the work with the notice of copyright as pro-
vided in section nine of this Act, there shall be promptly
deposited in the copyright office or in the mail addressed
to the register of copyrights, Washington, District of
Columbia, two complete copies of the best edition thereof 15
then published, which copies, if the work be a book or
periodical, shall have been produced in accordance with
the manufacturing provisions specified in section fifteen
of this Act; or if such work be a contribution to a peri- 20
odical, for which contribution special registration is re-
quested, one copy of the issue or issues containing such
contribution; or if the work is not reproduced in copies
for sale, there shall be deposited the copy, print, photo-
graph, or other identifying reproduction provided by 25
section eleven of this Act, such copies or copy, print,
photograph, or other reproduction to be accompanied in
each case by a claim of copyright.  No action or proceed-
ing shall be maintained for infringement of copyright in
any work until the provisions of this Act with respect to 30
the deposit of copies and registration of such work shall
have been complied with.

**Two complete copies of best edition.**

**Periodical contributions.**

**Work not reproduced in copies for sale.**

**No action for infringement until deposit of copies.**

SEC. 13. That should the copies called for by section
twelve of this Act not be promptly deposited as herein
provided, the register of copyrights may at any time after 35
the publication of the work, upon actual notice, require
the proprietor of the copyright to deposit them, and after
the said demand shall have been made, in default of the
deposit of copies of the work within three months from
any part of the United States, except an outlying terri- 40
torial possession of the United States, or within six
months from any outlying territorial possession of the

**Failure to deposit copies.**

**Register of copyrights may demand copies.**

**Failure to deposit on demand.**

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

United States, or from any foreign country, the proprietor of the copyright shall be liable to a fine of one hundred dollars and to pay to the Library of Congress twice the amount of the retail price of the best edition of the
5 work, and the copyright shall become void. <span style="float:right">Fine $100 and retail price of 2 copies, best edition. Forfeiture of copyright.</span>

SEC. 14. That the postmaster to whom are delivered the articles deposited as provided in sections eleven and twelve of this Act shall, if requested, give a receipt therefor and shall mail them to their destination without cost
10 to the copyright claimant. <span style="float:right">Postmaster's receipt.</span>

SEC. 15. That of the printed book or periodical specified in section five, subsections (a) and (b) of this Act, except the original text of a book of foreign origin in a language or languages other than English, the text of all
15 copies accorded protection under this Act, except as below provided, shall be printed from type set within the limits of the United States, either by hand or by the aid of any kind of typesetting machine, or from plates made within the limits of the United States from type set therein, or,
20 if the text be produced by lithographic process, or photoengraving process, then by a process wholly performed within the limits of the United States, and the printing of the text and binding of the said book shall be performed within the limits of the United States; which
25 requirements shall extend also to the illustrations within a book consisting of printed text and illustrations produced by lithographic process, or photo-engraving process, and also to separate lithographs or photo-engravings, except where in either case the subjects represented are
30 located in a foreign country and illustrate a scientific work or reproduce a work of art; but they shall not apply to works in raised characters for the use of the blind, or to books of foreign origin in a language or languages other than English, or to books published abroad in the
35 English language seeking ad interim protection under this Act. <span style="float:right">Printed from type set within the United States. Book in foreign language excepted. Lithographic or photo-engraving process. Printing and binding of the book. Illustrations in a book. Separate lithographs and photo-engravings. Books for blind excepted. Books in foreign languages excepted.</span>

SEC. 16. That in the case of the book the copies so deposited shall be accompanied by an affidavit, under the official seal of any officer authorized to administer oaths
40 within the United States, duly made by the person claiming copyright or by his duly authorized agent or repre- <span style="float:right">Affidavit of American manufacture.</span>

COPYRIGHT LAW OF THE UNITED STATES.

sentative residing in the United States, or by the printer
who has printed the book, setting forth that the copies
deposited have been printed from type set within the
limits of the United States or from plates made within
the limits of the United States from type set therein; or, 5
if the text be produced by lithographic process, or photo-
engraving process, that such process was wholly per-
formed within the limits of the United States, and that
Printing and the printing of the text and binding of the said book
binding of the
book. have also been performed within the limits of the United 10
States. Such affidavit shall state also the place where
Establish- and the establishment or establishments in which such
ment where
printing was type was set or plates were made or lithographic process,
done.
or photo-engraving process or printing and binding were
Date of pub- performed and the date of the completion of the printing 15
lication.
of the book or the date of publication.

False affida- SEC. 17. That any person who, for the purpose of ob-
vit, a misde-
meanor: fine, taining registration of a claim to copyright, shall know-
$1,000 and for-
feiture of copy- ingly make a false affidavit as to his having complied
right.
with the above conditions shall be deemed guilty of a 20
misdemeanor, and upon conviction thereof shall be pun-
ished by a fine of not more than one thousand dollars,
and all of his rights and privileges under said copy-
right shall thereafter be forfeited.

Notice of SEC. 18. That the notice of copyright required by sec- 25
copyright.
tion nine of this Act shall consist either of the word
" Copyright " or the abbreviation " Copr.", accompanied
by the name of the copyright proprietor, and if the work
be a printed literary, musical, or dramatic work, the
notice shall include also the year in which the copyright 30
was secured by publication. In the case, however, of
copies of works specified in subsections (f) to (k), inclu-
Notice on sive, of section five of this Act, the notice may consist
maps, copies of
works of art, of the letter C inclosed within a circle, thus: Ⓒ, accom-
photographs,
and prints. panied by the initials, monogram, mark, or symbol of the 35
Notice on copyright proprietor: *Provided*, That on some accessible
accessible por-
tion. portion of such copies or of the margin, back, permanent
base, or pedestal, or of the substance on which such copies
shall be mounted, his name shall appear. But in the case
Notice on of works in which copyright is subsisting when this Act 40
existing copy-
right works. shall go into effect, the notice of copyright may be either

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

in one of the forms prescribed herein or in one of those prescribed by the Act of June eighteenth, eighteen hundred and seventy-four.

[See pages 47, 48.]

SEC. 19. That the notice of copyright shall be applied, in the case of a book or other printed publication, upon its title-page or the page immediately following, or if a periodical either upon the title-page or upon the first page of text of each separate number or under the title heading, or if a musical work either upon its title-page or the first page of music: *Provided*, That one notice of copyright in each volume or in each number of a newspaper or periodical published shall suffice.

Notice of copyright on book.

On periodical.

One notice in each volume or periodical.

SEC. 20. That where the copyright proprietor has sought to comply with the provisions of this Act with respect to notice, the omission by accident or mistake of the prescribed notice from a particular copy or copies shall not invalidate the copyright or prevent recovery for infringement against any person who, after actual notice of the copyright, begins an undertaking to infringe it, but shall prevent the recovery of damages against an innocent infringer who has been misled by the omission of the notice; and in a suit for infringement no permanent injunction shall be had unless the copyright proprietor shall reimburse to the innocent infringer his reasonable outlay innocently incurred if the court, in its discretion, shall so direct.

Omission of notice by accident or mistake.

Innocent infringement.

SEC. 21. That in the case of a book published abroad in the English language before publication in this country, the deposit in the copyright office, not later than thirty days after its publication abroad, of one complete copy of the foreign edition, with a request for the reservation of the copyright and a statement of the name and nationality of the author and of the copyright proprietor and of the date of publication of the said book, shall secure to the author or proprietor an ad interim copyright, which shall have all the force and effect given to copyright by this Act, and shall endure until the expiration of thirty days after such deposit in the copyright office.

Book published abroad in the English language.

Ad interim copyright for 30 days.

SEC. 22. That whenever within the period of such ad interim protection an authorized edition of such book shall be published within the United States, in accordance with the manufacturing provisions specified in section

Extension to full term.

COPYRIGHT LAW OF THE UNITED STATES.

fifteen of this Act, and whenever the provisions of this
Act as to deposit of copies, registration, filing of affidavit,
and the printing of the copyright notice shall have been
duly complied with, the copyright shall be extended to
endure in such book for the full term elsewhere provided 5
in this Act.

Deposit of copies, filing of affidavit.

SEC. 23. That the copyright secured by this Act shall
endure for twenty-eight years from the date of first pub-
lication, whether the copyrighted work bears the author's
true name or is published anonymously or under an as- 10
sumed name: *Provided,* That in the case of any posthu-
mous work or of any periodical, cyclopædic, or other com-
posite work upon which the copyright was originally
secured by the proprietor thereof, or of any work copy-
righted by a corporate body (otherwise than as assignee 15
or licensee of the individual author) or by an employer
for whom such work is made for hire, the proprietor of
such copyright shall be entitled to a renewal and exten-
sion of the copyright in such work for the further term
of twenty-eight years when application for such renewal 20
and extension shall have been made to the copyright
office and duly registered therein within one year prior
to the expiration of the original term of copyright: *And
provided further,* That in the case of any other copy-
righted work, including a contribution by an individual 25
author to a periodical or to a cyclopædic or other compos-
ite work when such contribution has been separately reg-
istered, the author of such work, if still living, or the
widow, widower, or children of the author, if the author
be not living, or if such author, widow, widower, or chil- 30
dren be not living, then the author's executors, or in the
absence of a will, his next of kin shall be entitled to a
renewal and extension of the copyright in such work for
a further term of twenty-eight years when application
for such renewal and extension shall have been made to 35
the copyright office and duly registered therein within
one year prior to the expiration of the original term of
copyright: *And provided further,* That in default of
the registration of such application for renewal and ex-
tension, the copyright in any work shall determine at the 40
expiration of twenty-eight years from first publication.

Duration of copyright: 1st term, 28 years.

Posthumous works, periodicals, cyclopædic or composite works.

Renewal term 28 years.

Other copyrighted works, first term 28 years.

Renewal term 28 years: to author, widow, widower, children, heirs or next of kin.

Notice that renewal term is desired.

Copyright ends in 28 years unless renewed.

585 - 914 O - 63 - 6

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

SEC. 24. That the copyright subsisting in any work at the time when this Act goes into effect may, at the expiration of the term provided for under existing law, be renewed and extended by the author of such work if still
5 living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then by the author's executors, or in the absence of a will, his next of kin, for a further period such that the entire term shall be
10 equal to that secured by this Act, including the renewal period: *Provided, however,* That if the work be a composite work upon which copyright was originally secured by the proprietor thereof, then such proprietor shall be entitled to the privilege of renewal and extension granted
15 under this section: *Provided,* That application for such renewal and extension shall be made to the copyright office and duly registered therein within one year prior to the expiration of the existing term.

*Extension of subsisting copyrights.*

*Proprietor entitled to renewal for composite work.*

*Renewal application.*

SEC. 25. That if any person shall infringe the copyright
20 in any work protected under the copyright laws of the United States such person shall be liable:

*Infringement of copyright.*

(a) To an injunction restraining such infringement;

*Injunction.*

(b) To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the
25 infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages
30 and profits such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but in the case of a newspaper reproduction of a copyrighted photograph such damages shall not exceed the
35 sum of two hundred dollars nor be less than the sum of fifty dollars, and such damages shall in no other case exceed the sum of five thousand dollars nor be less than the sum of two hundred and fifty dollars, and shall not be regarded as a penalty:

*Damages.*

*Proving sales.*

*Newspaper reproduction of photograph; recovery, $50-$200.*

*Maximum recovery, $5,000.*

*Minimum recovery, $250.*

40 First. In the case of a painting, statue, or sculpture, ten dollars for every infringing copy made or

*Painting, statue, or sculpture, $10 for every infringing copy.*

COPYRIGHT LAW OF THE UNITED STATES.

sold by or found in the possession of the infringer or his agents or employees;

Second. In the case of any work enumerated in section five of this Act, except a painting, statue, or sculpture, one dollar for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

*Other works, $1 for every infringing copy.*

Third. In the case of a lecture, sermon, or address, fifty dollars for every infringing delivery;

Fourth. In the case of dramatic or dramatico-musical or a choral or orchestral composition, one hundred dollars for the first and fifty dollars for every subsequent infringing performance; in the case of other musical compositions, ten dollars for every infringing performance;

*Lectures, $50 for every infringing delivery.*
*Dramatic or musical works, $100 for first and $50 for subsequent infringing performance.*
*Other musical compositions, $10 for every infringing performance.*

(c) To deliver up on oath, to be impounded during the pendency of the action, upon such terms and conditions as the court may prescribe, all articles alleged to infringe a copyright;

*Delivering up infringing articles.*

(d) To deliver up on oath for destruction all the infringing copies or devices, as well as all plates, molds, matrices, or other means for making such infringing copies as the court may order;

*Destruction of infringing copies, etc.*

(e) Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section one, subsection (e), of this Act: *Provided also*, That whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this Act, he shall serve notice of such intention, by registered mail, upon the copyright

*Infringement by mechanical musical instruments.*
*Injunction may be granted.*
*Recovery of royalty.*
*Notice to proprietor of intention to use.*

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

proprietor at his last address disclosed by the records of
the copyright office, sending to the copyright office a
duplicate of such notice; and in case of his failure so to
do the court may, in its discretion, in addition to sums
5 hereinabove mentioned, award the complainant a further Damages,
three times
sum, not to exceed three times the amount provided by amount pro-
vided.
section one, subsection (e), by way of damages, and not as Temporary
injunction.
a penalty, and also a temporary injunction until the full
award is paid.

10 Rules and regulations for practice and procedure under Rules for
practice and
this section shall be prescribed by the Supreme Court of procedure.
the United States.

SEC. 26. That any court given jurisdiction under sec- Judgment en-
forcing reme-
tion thirty-four of this Act may proceed in any action, dies.
15 suit, or proceeding instituted for violation of any pro-
vision hereof to enter a judgment or decree enforcing the
remedies herein provided.

SEC. 27. That the proceedings for an injunction, dam- Proceedings,
injunction, etc.,
ages, and profits, and those for the seizure of infringing may be united
in one action.
20 copies, plates, molds, matrices, and so forth, aforemen-
tioned, may be united in one action.

SEC. 28. That any person who willfully and for profit Penalty for
willful in-
shall infringe any copyright secured by this Act, or who fringement.
shall knowingly and willfully aid or abet such infringe-
25 ment, shall be deemed guilty of a misdemeanor, and upon
conviction thereof shall be punished by imprisonment for
not exceeding one year or by a fine of not less than one
hundred dollars nor more than one thousand dollars, or
both, in the discretion of the court: *Provided, however,*
30 That nothing in this Act shall be so construed as to pre- Oratorios,
cantatas, etc.,
vent the performance of religious or secular works, such may be per-
formed
as oratorios, cantatas, masses, or octavo choruses by pub-
lic schools, church choirs, or vocal societies, rented, bor-
rowed, or obtained from some public library, public
35 school, church choir, school choir, or vocal society, pro-
vided the performance is given for charitable or educa-
tional purposes and not for profit.

SEC. 29. That any person who, with fraudulent intent, False notice
of copyright
shall insert or impress any notice of copyright required (penalty for).
40 by this Act, or words of the same purport, in or upon any
uncopyrighted article, or with fraudulent intent shall Fraudulent
removal of
remove or alter the copyright notice upon any article duly notice; fine
$100–$1,000.

COPYRIGHT LAW OF THE UNITED STATES.

copyrighted shall be guilty of a misdemeanor, punishable by a fine of not less than one hundred dollars and not more than one thousand dollars. Any person who shall knowingly issue or sell any article bearing a notice of United States copyright which has not been copyrighted 5 in this country, or who shall knowingly import any article bearing such notice or words of the same purport, which has not been copyrighted in this country, shall be liable to a fine of one hundred dollars.

*Issuing, selling, or importing article bearing false notice: fine $100.*

SEC. 30. That the importation into the United States 10 of any article bearing a false notice of copyright when there is no existing copyright thereon in the United States, or of any piratical copies of any work copyrighted in the United States, is prohibited.

*Importation prohibited of articles bearing false notice and piratical copies.*

SEC. 31. That during the existence of the American 15 copyright in any book the importation into the United States of any piratical copies thereof or of any copies thereof (although authorized by the author or proprietor) which have not been produced in accordance with the manufacturing provisions specified in section fifteen 20 of this Act, or any plates of the same not made from type set within the limits of the United States, or any copies thereof produced by lithographic or photo-engraving process not performed within the limits of the United States, in accordance with the provisions of section fif- 25 teen of this Act, shall be, and is hereby, prohibited: *Provided, however,* That, except as regards piratical copies, such prohibition shall not apply:

*Prohibition of importation of books.*

*Exceptions to prohibition of importation:*

(a) To works in raised characters for the use of the blind; 30

*Works for the blind.*

(b) To a foreign newspaper or magazine, although containing matter copyrighted in the United States printed or reprinted by authority of the copyright proprietor, unless such newspaper or magazine contains also copyright matter printed or reprinted without such au- 35 thorization;

*Foreign newspapers or magazines.*

(c) To the authorized edition of a book in a foreign language or languages of which only a translation into English has been copyrighted in this country;

*Books in foreign languages of which only translations are copyrighted.*

(d) To any book published abroad with the authoriza- 40 tion of the author or copyright proprietor when imported

*Importation of authorized foreign books permitted.*

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

under the circumstances stated in one of the four subdivisions following, that is to say:

First. When imported, not more than one copy at one time, for individual use and not for sale; but such privilege of importation shall not extend to a foreign reprint of a book by an American author copyrighted in the United States; <span style="float:right">*For individual use and not for sale.*</span>

Second. When imported by the authority or for the use of the United States; <span style="float:right">*For the use of the United States.*</span>

Third. When imported, for use and not for sale, not more than one copy of any such book in any one invoice, in good faith, by or for any society or institution incorporated for educational, literary, philosophical, scientific, or religious purposes, or for the encouragement of the fine arts, or for any college, academy, school, or seminary of learning, or for any State, school, college, university, or free public library in the United States; <span style="float:right">*For the use of societies, libraries, etc.*</span>

Fourth. When such books form parts of libraries or collections purchased en bloc for the use of societies, institutions, or libraries designated in the foregoing paragraph, or form parts of the libraries or personal baggage belonging to persons or families arriving from foreign countries and are not intended for sale: *Provided,* That copies imported as above may not lawfully be used in any way to violate the rights of the proprietor of the American copyright or annul or limit the copyright protection secured by this Act, and such unlawful use shall be deemed an infringement of copyright. <span style="float:right">*Libraries purchased en bloc.*<br>*Books brought personally into the United States.*<br>*Imported copies not to be used to violate copyright.*</span>

SEC. 32. That any and all articles prohibited importation by this Act which are brought into the United States from any foreign country (except in the mails) shall be seized and forfeited by like proceedings as those provided by law for the seizure and condemnation of property imported into the United States in violation of the customs revenue laws. Such articles when forfeited shall be destroyed in such manner as the Secretary of the Treasury or the court, as the case may be, shall direct: *Provided, however,* That all copies of authorized editions of copyright books imported in the mails or otherwise in viola- <span style="float:right">*Seizure of unlawfully imported copies.*<br>*Copies of authorized books imported may be returned.*</span>

COPYRIGHT LAW OF THE UNITED STATES.

tion of the provisions of this Act may be exported and returned to the country of export whenever it is shown to the satisfaction of the Secretary of the Treasury, in a written application, that such importation does not involve willful negligence or fraud.                    5

**Secretary of Treasury and Postmaster-General to make rules to prevent unlawful importation.** SEC. 33. That the Secretary of the Treasury and the Postmaster-General are hereby empowered and required to make and enforce such joint rules and regulations as shall prevent the importation into the United States in the mails of articles prohibited importation by this Act, 10 and may require notice to be given to the Treasury Department or Post-Office Department, as the case may be, by copyright proprietors or injured parties, of the actual or contemplated importation of articles prohibited importation by this Act, and which infringe the rights of 15 such copyright proprietors or injured parties.

**Jurisdiction of courts in copyright cases.** SEC. 34. That all actions, suits, or proceedings arising under the copyright laws of the United States shall be originally cognizable by the circuit courts of the United States, the district court of any Territory, the supreme 20 court of the District of Columbia, the district courts of Alaska, Hawaii, and Porto Rico, and the courts of first instance of the Philippine Islands.

**District in which suit may be brought.** SEC. 35. That civil actions, suits, or proceedings arising under this Act may be instituted in the district of which 25 the defendant or his agent is an inhabitant, or in which he may be found.

**Injunctions may be granted.** SEC. 36. That any such court or judge thereof shall have power, upon bill in equity filed by any party aggrieved, to grant injunctions to prevent and restrain the 30 violation of any right secured by said laws, according to the course and principles of courts of equity, on such terms as said court or judge may deem reasonable. Any injunction that may be granted restraining and enjoining the doing of anything forbidden by this Act may be 35 served on the parties against whom such injunction may be granted anywhere in the United States, and shall be operative throughout the United States and be enforceable by proceedings in contempt or otherwise by any other court or judge possessing jurisdiction of the de- 40 fendants.

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

Sec. 37. That the clerk of the court, or judge granting the injunction, shall, when required so to do by the court hearing the application to enforce said injunction, transmit without delay to said court a certified copy of all the
5 papers in said cause that are on file in his office.

*Certified copy of papers filed.*

Sec. 38. That the orders, judgments, or decrees of any court mentioned in section thirty-four of this Act arising under the copyright laws of the United States may be reviewed on appeal or writ of error in the manner and to
10 the extent now provided by law for the review of cases determined in said courts, respectively.

*Judgments, etc., may be reviewed on appeal or writ of error.*

Sec. 39. That no criminal proceeding shall be maintained under the provisions of this Act unless the same is commenced within three years after the cause of action
15 arose.

*No criminal proceedings shall be maintained after three years.*

Sec. 40. That in all actions, suits, or proceedings under this Act, except when brought by or against the United States or any officer thereof, full costs shall be allowed, and the court may award to the prevailing party a reason-
20 able attorney's fee as part of the costs.

*Full costs shall be allowed.*

Sec. 41. That the copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright,
25 nor shall the assignment of the copyright constitute a transfer of the title to the material object; but nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.

*Copyright distinct from property in material object.*

*Transfer of any copy of copyrighted work permitted.*

30 Sec. 42. That copyright secured under this or previous Acts of the United States may be assigned, granted, or mortgaged by an instrument in writing signed by the proprietor of the copyright, or may be bequeathed by will.

*Copyright may be assigned, mortgaged, or bequeathed by will.*

Sec. 43. That every assignment of copyright executed
35 in a foreign country shall be acknowledged by the assignor before a consular officer or secretary of legation of the United States authorized by law to administer oaths or perform notarial acts. The certificate of such acknowledgement under the hand and official seal of such
40 consular officer or secretary of legation shall be prima facie evidence of the execution of the instrument.

*Assignment executed in foreign country to be acknowledged.*

COPYRIGHT LAW OF THE UNITED STATES.

Assignments to be recorded.

SEC. 44. That every assignment of copyright shall be recorded in the copyright office within three calendar months after its execution in the United States or within six calendar months after its execution without the limits of the United States, in default of which it shall be void 5 as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, whose assignment has been duly recorded.

Register of copyrights to record assignments.

SEC. 45. That the register of copyrights shall, upon payment of the prescribed fee, record such assignment, 10 and shall return it to the sender with a certificate of record attached under seal of the copyright office, and upon the payment of the fee prescribed by this Act he shall furnish to any person requesting the same a certified copy thereof under the said seal. 15

Assignee's name may be substituted in copyright notice.

SEC. 46. That when an assignment of the copyright in a specified book or other work has been recorded the assignee may substitute his name for that of the assignor in the statutory notice of copyright prescribed by this Act.

Copyright records.

SEC. 47. That all records and other things relating to 20 copyrights required by law to be preserved shall be kept and preserved in the copyright office, Library of Congress, District of Columbia, and shall be under the control of the register of copyrights, who shall, under the direction and supervision of the Librarian of Congress, per- 25 form all the duties relating to the registration of copyrights.

Register of copyrights and assistant register of copyrights.

SEC. 48. That there shall be appointed by the Librarian of Congress a register of copyrights, at a salary of four thousand dollars per annum, and one assistant register of 30 copyrights, at a salary of three thousand dollars per annum, who shall have authority during the absence of the register of copyrights to attach the copyright office seal to all papers issued from the said office and to sign such certificates and other papers as may be necessary. 35 There shall also be appointed by the Librarian such subordinate assistants to the register as may from time to time be authorized by law.

Register of copyrights to deposit and account for fees.

SEC. 49. That the register of copyrights shall make daily deposits in some bank in the District of Columbia, 40 designated for this purpose by the Secretary of the Treas-

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

ury as a national depository, of all moneys received to
be applied as copyright fees, and shall make weekly de-
posits with the Secretary of the Treasury, in such manner
as the latter shall direct, of all copyright fees actually
5 applied under the provisions of this Act, and annual
deposits of sums received which it has not been possible
to apply as copyright fees or to return to the remitters,
and shall also make monthly reports to the Secretary of Shall make monthly re-
the Treasury and to the Librarian of Congress of the port of fees.
10 applied copyright fees for each calendar month, together
with a statement of all remittances received, trust funds
on hand, moneys refunded, and unapplied balances.

SEC. 50. That the register of copyrights shall give bond Bond of register of copyrights.
to the United States in the sum of twenty thousand dol-
15 lars, in form to be approved by the Solicitor of the
Treasury and with sureties satisfactory to the Secretary
of the Treasury, for the faithful discharge of his duties.

SEC. 51. That the register of copyrights shall make an Annual report of register of copyrights.
annual report to the Librarian of Congress, to be printed
20 in the annual report on the Library of Congress, of all
copyright business for the previous fiscal year, including
the number and kind of works which have been deposited
in the copyright office during the fiscal year, under the
provisions of this Act.

25 SEC. 52. That the seal provided under the Act of July Seal of copyright office.
eighth, eighteen hundred and seventy, and at present used
in the copyright office, shall continue to be the seal
thereof, and by it all papers issued from the copyright
office requiring authentication shall be authenticated.

30 SEC. 53. That, subject to the approval of the Librarian Rules for the registration of copyrights.
of Congress, the register of copyrights shall be authorized
to make rules and regulations for the registration of
claims to copyright as provided by this Act.

SEC. 54. That the register of copyrights shall provide Record books.
35 and keep such record books in the copyright office as are
required to carry out the provisions of this Act, and when- Entry of copyright.
ever deposit has been made in the copyright office of a
copy of any work under the provisions of this Act he
shall make entry thereof.

40 SEC. 55. That in the case of each entry the person re- Certificate of registration.
corded as the claimant of the copyright shall be entitled

COPYRIGHT LAW OF THE UNITED STATES.

to a certificate of registration under seal of the copyright
office, to contain his name and address, the title of the work
upon which copyright is claimed, the date of the deposit
of the copies of such work, and such marks as to class
designation and entry number as shall fully identify the 5
entry. In the case of a book the certificate shall also
state the receipt of the affidavit as provided by section
sixteen of this Act, and the date of the completion of the
printing, or the date of the publication of the book, as
stated in the said affidavit. The register of copyrights 10
shall prepare a printed form for the said certificate, to
be filled out in each case as above provided for, which cer-
tificate, sealed with the seal of the copyright office, shall,
upon payment of the prescribed fee, be given to any per-
son making application for the same, and the said certifi- 15
cate shall be admitted in any court as prima facie evidence
of the facts stated therein. In addition to such certificate
the register of copyrights shall furnish, upon request,
without additional fee, a receipt for the copies of the
work deposited to complete the registration. 20

*Certificate for book to state receipt of affidavit.*

*Certificate may be given to any person.*

*Receipt for copies deposited.*

SEC. 56. That the register of copyrights shall fully
index all copyright registrations and assignments and
shall print at periodic intervals a catalogue of the titles
of articles deposited and registered for copyright, together
with suitable indexes, and at stated intervals shall print 25
complete and indexed catalogues for each class of copy-
right entries, and may thereupon, if expedient, destroy
the original manuscript catalogue cards containing the
titles included in such printed volumes and representing
the entries made during such intervals. The current cata- 30
logues of copyright entries and the index volumes herein
provided for shall be admitted in any court as prima facie
evidence of the facts stated therein as regards any copy-
right registration.

*Index to copyright reg-istrations.*

*Catalogue of copyright en-tries.*

*Catalogue cards.*

*Catalogues and indexes prima facie ev-idence.*

SEC. 57. That the said printed current catalogues as 35
they are issued shall be promptly distributed by the copy-
right office to the collectors of customs of the United
States and to the postmasters of all exchange offices of
receipt of foreign mails, in accordance with revised lists
of such collectors of customs and postmasters prepared 40
by the Secretary of the Treasury and the Postmaster-

*Distribution of catalogue of copyright en-tries.*

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

General, and they shall also be furnished to all parties Subscription desiring them at a price to be determined by the register price. of copyrights, not exceeding five dollars per annum for the complete catalogue of copyright entries and not ex-
5 ceeding one dollar per annum for the catalogues issued during the year for any one class of subjects. The consolidated catalogues and indexes shall also be supplied to all persons ordering them at such prices as may be determined to be reasonable, and all subscriptions for the
10 catalogues shall be received by the Superintendent of Superintend-ent of docu-Public Documents, who shall forward the said publica- ments to re-ceive subscrip-tions; and the moneys thus received shall be paid into the tions. Treasury of the United States and accounted for under such laws and Treasury regulations as shall be in force
15 at the time.

SEC. 58. That the record books of the copyright office, Record books, etc., open to together with the indexes to such record books, and all inspection. works deposited and retained in the copyright office, shall be open to public inspection; and copies may be taken of Copies m a y be taken of en-
20 the copyright entries actually made in such record books, tries in record books. subject to such safeguards and regulations as shall be prescribed by the register of copyrights and approved by the Librarian of Congress.

SEC. 59. That of the articles deposited in the copyright Disposition of copyright de-
25 office under the provisions of the copyright laws of the posits. United States or of this Act, the Librarian of Congress shall determine what books and other articles shall be transferred to the permanent collections of the Library of Congress, including the law library, and what other
30 books or articles shall be placed in the reserve collections of the Library of Congress for sale or exchange, or be Preservation of copyright de-transferred to other governmental libraries in the Dis- posits. trict of Columbia for use therein.

SEC. 60. That any articles undisposed of as above Disposal of copyright de-
35 provided, together with all titles and correspondence re- posits. lating thereto, the Librarian of Congress and the register of copyrights jointly shall, at suitable intervals, determine what of these received during any period of years it is desirable or useful to preserve in the permanent files of
40 the copyright office, and, after due notice as hereinafter provided, may within their discretion cause the remain-

COPYRIGHT LAW OF THE UNITED STATES.

ing articles and other things to be destroyed: *Provided,*
That there shall be printed in the Catalogue of Copy-
right Entries from February to November, inclusive, a
statement of the years of receipt of such articles and a
notice to permit any author, copyright proprietor, or 5
other lawful claimant to claim and remove before the
expiration of the month of December of that year any-
thing found which relates to any of his productions de-
posited or registered for copyright within the period of
years stated, not reserved or disposed of as provided for 10
in this Act: *And provided further,* That no manuscript
of an unpublished work shall be destroyed during its
term of copyright without specific notice to the copyright
proprietor of record, permitting him to claim and re-
move it. 15

Manuscript copies to be preserved.

Fees.

SEC. 61. That the register of copyrights shall receive,
and the persons to whom the services designated are ren-
dered shall pay, the following fees: For the registration
of any work subject to copyright, deposited under the
provisons of this Act, one dollar, which sum is to include 20
a certificate of registration under seal: *Provided,* That in
the case of photographs the fee shall be fifty cents where
a certificate is not demanded. For every additional cer-
tificate of registration made, fifty cents. For recording
and certifying any instrument of writing for the assign- 25
ment of copyright, or any such license specified in section
one, subsection (e), or for any copy of such assignment
or license, duly certified, if not over three hundred words
in length, one dollar; if more than three hundred and
less than one thousand words in length, two dollars; if 30
more than one thousand words in length, one dollar addi-
tional for each one thousand words or fraction thereof
over three hundred words. For recording notice of
user or acquiescence specified in section one, subsection
(e), twenty-five cents for each notice if not over fifty 35
words, and an additional twenty-five cents for each addi-
tional one hundred words. For comparing any copy of
an assignment with the record of such document in the
copyright office and certifying the same under seal, one
dollar. For recording the extension or renewal of copy- 40
right provided for in sections twenty-three and twenty-

Fee for registration.

Fee for certificate.

Fee for recording assignment.

Fee for copy of assignment.

Fee for recording notice of user upon mechanical musical instruments.

Fee for comparing copy of assignment.

Fee for recording renewal of copyright.

ACT OF MARCH 4, 1909 (IN EFFECT JULY 1, 1909).

four of this Act, fifty cents. For recording the transfer *Fee for recording transfer of proprietorship.* of the proprietorship of copyrighted articles, ten cents for each title of a book or other article, in addition to the fee prescribed for recording the instrument of assign-

5 ment. For any requested search of copyright office rec- *Fee for search.* ords, indexes, or deposits, fifty cents for each full hour of time consumed in making such search: *Provided,* That *Only one registration required for work in several volumes.* only one registration at one fee shall be required in the case of several volumes of the same book deposited at the

10 same time.

SEC. 62. That in the interpretation and construction of *Definitions: "Date of publication."* this Act "the date of publication" shall in the case of a work of which copies are reproduced for sale or distribu-

tion be held to be the earliest date when copies of the first

15 authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority, and the word "author" shall include an *"Author."* employer in the case of works made for hire.

SEC. 63. That all laws or parts of laws in conflict with *Repealing clause.*

20 the provisions of this Act are hereby repealed, but nothing in this Act shall affect causes of action for infringement of copyright heretofore committed now pending in courts of the United States, or which may hereafter be insti-

tuted; but such causes shall be prosecuted to a conclusion

25 in the manner heretofore provided by law.

SEC. 64. That this Act shall go into effect on the first *Date of enforcement.* day of July, nineteen hundred and nine.

Approved, March 4, 1909.

[60th Congress, 2d session.]

# FEDERAL RULES

## OF

# CIVIL PROCEDURE

———————

WITH FORMS

———————

DECEMBER 1, 2012



Printed for the use
of

THE COMMITTEE ON THE JUDICIARY

HOUSE OF REPRESENTATIVES

attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

(2) *Motion for Sanctions.* A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

(3) *On the Court s Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

(4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) *Limitations on Monetary Sanctions.* The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) INAPPLICABILITY TO DISCOVERY. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

(As amended Apr. 28, 1983, eff. Aug. 1, 1983; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)

**Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing**

(a) TIME TO SERVE A RESPONSIVE PLEADING.

(1) *In General.* Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

(A) A defendant must serve an answer:

(i) within 21 days after being served with the summons and complaint; or

(ii) if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent,

17          FEDERAL RULES OF CIVIL PROCEDURE          **Rule 12**

or within 90 days after it was sent to the defendant outside any judicial district of the United States.

(B) A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

(C) A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

(2) *United States and Its Agencies, Officers, or Employees Sued in an Official Capacity.* The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

(3) *United States Officers or Employees Sued in an Individual Capacity.* A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

(4) *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

(A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

(B) if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

(b) How To Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

(c) Motion for Judgment on the Pleadings. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

(d) Result of Presenting Matters Outside the Pleadings. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All

**Rule 12**     FEDERAL RULES OF CIVIL PROCEDURE     18

parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

(e) MOTION FOR A MORE DEFINITE STATEMENT. A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

(f) MOTION TO STRIKE. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

    (1) on its own; or

    (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

(g) JOINING MOTIONS.

    (1) *Right to Join.* A motion under this rule may be joined with any other motion allowed by this rule.

    (2) *Limitation on Further Motions.* Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

(h) WAIVING AND PRESERVING CERTAIN DEFENSES.

    (1) *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)–(5) by:

        (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or

        (B) failing to either:

            (i) make it by motion under this rule; or

            (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

    (2) *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

        (A) in any pleading allowed or ordered under Rule 7(a);

        (B) by a motion under Rule 12(c); or

        (C) at trial.

    (3) *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

(i) HEARING BEFORE TRIAL. If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

(2) *Defending Against a Demand for Judgment for the Plaintiff.* The third-party plaintiff may demand judgment in the plaintiff's favor against the third-party defendant. In that event, the third-party defendant must defend under Rule 12 against the plaintiff's claim as well as the third-party plaintiff's claim; and the action proceeds as if the plaintiff had sued both the third-party defendant and the third-party plaintiff.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

## Rule 15. Amended and Supplemental Pleadings

(a) AMENDMENTS BEFORE TRIAL.

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3) *Time to Respond.* Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

(b) AMENDMENTS DURING AND AFTER TRIAL.

(1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

(c) RELATION BACK OF AMENDMENTS.

(1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

**Rule 16**   FEDERAL RULES OF CIVIL PROCEDURE   22

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

(2) *Notice to the United States.* When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

(d) SUPPLEMENTAL PLEADINGS. On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

(As amended Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Pub. L. 102–198, §11(a), Dec. 9, 1991, 105 Stat. 1626; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

**Rule 16. Pretrial Conferences; Scheduling; Management**

(a) PURPOSES OF A PRETRIAL CONFERENCE. In any action, the court may order the attorneys and any unrepresented parties to appear for one or more pretrial conferences for such purposes as:

(1) expediting disposition of the action;

(2) establishing early and continuing control so that the case will not be protracted because of lack of management;

(3) discouraging wasteful pretrial activities;

(4) improving the quality of the trial through more thorough preparation; and

(5) facilitating settlement.

(b) SCHEDULING.

(1) *Scheduling Order.* Except in categories of actions exempted by local rule, the district judge—or a magistrate judge when authorized by local rule—must issue a scheduling order:

(A) after receiving the parties' report under Rule 26(f); or

(B) after consulting with the parties' attorneys and any unrepresented parties at a scheduling conference or by telephone, mail, or other means.

(2) *Time to Issue.* The judge must issue the scheduling order as soon as practicable, but in any event within the earlier of 120 days after any defendant has been served with the complaint or 90 days after any defendant has appeared.

**Copyright Office, Library of Congress** §201.10

for recordation, including the prescribed fee, have been received in the Copyright Office. A document is filed in the Copyright Office, and a filing in the Copyright Office takes place on the date of recordation. After recordation the document is returned to the sender with a certificate of record.

(17 U.S.C. 207 and 17 U.S.C. 118, 702, 708(11), as amended by Pub. L. 94–553)

[42 FR 16777, Mar. 30, 1977, as amended at 46 FR 33249, June 29, 1981; 56 FR 59885, Nov. 26, 1991; 64 FR 29521, June 1, 1999]

### §201.10 Notices of termination of transfers and licenses.

This section covers notices of termination of transfers and licenses under sections 203, 304(c) and 304(d) of title 17, of the United States Code. A termination under section 304(d) is possible only if no termination was made under section 304(c), and federal copyright was originally secured on or between January 1, 1923, and October 26, 1939.

(a) *Form.* The Copyright Office does not provide printed forms for the use of persons serving notices of termination.

(b) *Contents.* (1) A notice of termination covering the extended renewal term under sections 304(c) and 304(d) of title 17, U.S.C., must include a clear identification of each of the following:

(i) Whether the termination is made under section 304(c) or under section 304(d);

(ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

(iii) The title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number;

(iv) A brief statement reasonably identifying the grant to which the notice of termination applies;

(v) The effective date of termination;

(vi) If termination is made under section 304(d), a statement that termination of renewal term rights under section 304(c) has not been previously exercised; and

(vii) In the case of a termination of a grant executed by a person or persons other than the author, a listing of the surviving person or persons who executed the grant. In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed by all persons whose signature is necessary to terminate the grant under section 304 of title 17, U.S.C., or by their duly authorized agents.

(2) A notice of termination of an exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, under section 203 of title 17, U.S.C., must include a clear identification of each of the following:

(i) A statement that the termination is made under section 203;

(ii) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;

(iii) The date of execution of the grant being terminated and, if the grant covered the right of publication of a work, the date of publication of the work under the grant;

(iv) For each work to which the notice of termination applies, the title of the work and the name of the author

499

or, in the case of a joint work, the authors who executed the grant being terminated; and, if possible and practicable, the original copyright registration number;

(v) A brief statement reasonably identifying the grant to which the notice of termination applies;

(vi) The effective date of termination; and

(vii) In the case of a termination of a grant executed by one or more of the authors of the work where the termination is exercised by the successors of a deceased author, a listing of the names and relationships to that deceased author of all of the following, together with specific indication of the person or persons executing the notice who constitute more than one-half of that author's termination interest: That author's surviving widow or widower; and all of that author's surviving children; and, where any of that author's children are dead, all of the surviving children of any such deceased child of that author; however, instead of the information required by this paragraph (b)(2)(vii), the notice may contain both of the following:

(A) A statement of as much of such information as is currently available to the person or persons signing the notice, with a brief explanation of the reasons why full information is or may be lacking; together with

(B) A statement that, to the best knowledge and belief of the person or persons signing the notice, the notice has been signed by all persons whose signature is necessary to terminate the grant under section 203 of title 17, U.S.C., or by their duly authorized agents.

(3) Clear identification of the information specified by paragraphs (b)(1) and (b)(2) of this section requires a complete and unambiguous statement of facts in the notice itself, without incorporation by reference of information in other documents or records.

(c) *Signature.* (1) In the case of a termination of a grant under section 304(c) or section 304(d) executed by a person or persons other than the author, the notice shall be signed by all of the surviving person or persons who executed the grant, or by their duly authorized agents.

(2) In the case of a termination of a grant under section 304(c) or section 304(d) executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or by his or her duly authorized agent. If that author is dead, the notice shall be signed by the number and proportion of the owners of that author's termination interest required under section 304(c) or section 304(d), whichever applies, of title 17, U.S.C., or by their duly authorized agents, and shall contain a brief statement of their relationship or relationships to that author.

(3) In the case of a termination of a grant under section 203 executed by one or more of the authors of the work, the notice shall be signed by each author who is terminating the grant or by his or her duly authorized agent. If that author is dead, the notice shall be signed by the number and proportion of the owners of that author's termination interest required under section 203 of title 17, U.S.C., or by their duly authorized agents, and shall contain a brief statement of their relationship or relationships to that author.

(4) Where a signature is by a duly authorized agent, it shall clearly identify the person or persons on whose behalf the agent is acting.

(5) The handwritten signature of each person effecting the termination shall either be accompanied by a statement of the full name and address of that person, typewritten or printed legibly by hand, or shall clearly correspond to such a statement elswhere in the notice.

(d) *Service.* (1) The notice of termination shall be served upon each grantee whose rights are being terminated, or the grantee's successor in title, by personal service, or by first-class mail sent to an address which, after a reasonable investigation, is found to be the last known address of the grantee or successor in title.

(2) The service provision of section 203, section 304(c) or section 304(d) of title 17, U.S.C., whichever applies, will

**Copyright Office, Library of Congress** §201.10

be satisfied if, before the notice of termination is served, a reasonable investigation is made by the person or persons executing the notice as to the current ownership of the rights being terminated, and based on such investigation:

(i) If there is no reason to believe that such rights have been transferred by the grantee to a successor in title, the notice is served on the grantee; or

(ii) If there is reason to believe that such rights have been transferred by the grantee to a particular successor in title, the notice is served on such successor in title.

(3) For purposes of paragraph (d)(2) of this section, a *reasonable investigation* includes, but is not limited to, a search of the records in the Copyright Office: in the case of a musical composition with respect to which performing rights are licensed by a performing rights society, a "reasonable investigation" also includes a report from that performing rights society identifying the person or persons claiming current ownership of the rights being terminated.

(4) Compliance with the provisions of paragraphs (d)(2) and (d)(3) of this section will satisfy the service requirements of section 203, section 304(c), or section 304(d) of title 17, U.S.C., whichever applies. However, as long as the statutory requirements have been met, the failure to comply with the regulatory provisions of paragraph (d)(2) or (d)(3) of this section will not affect the validity of the service.

(e) *Harmless errors.* (1) Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of section 203, section 304(c), or section 304(d) of title 17, U.S.C., whichever applies, shall not render the notice invalid.

(2) Without prejudice to the general rule provided by paragraph (e)(1) of this section, errors made in giving the date or registration number referred to in paragraph (b)(1)(iii), (b)(2)(iii), or (b)(2)(iv) of this section, or in complying with the provisions of paragraph (b)(1)(vii) or (b)(2)(vii) of this section, or in describing the precise relationships under paragraph (c)(2) or (c)(3) of this section, shall not affect the validity of the notice if the errors were

made in good faith and without any intention to deceive, mislead, or conceal relevant information.

(f) *Recordation.* (1) A copy of the notice of termination will be recorded in the Copyright Office upon payment of the fee prescribed by paragraph (2) of this paragraph (f) and upon compliance with the following provisions:

(i) The copy submitted for recordation shall be a complete and exact duplicate of the notice of termination as served and shall include the actual signature or signatures, or a reproduction of the actual signature or signatures, appearing on the notice; where separate copies of the same notice were served on more than one grantee or successor in title, only one copy need be submitted for recordation; and

(ii) The copy submitted for recordation shall be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice. In instances where service is made by first-class mail, the date of service shall be the day the notice of termination was deposited with the United States Postal Service.

(iii) The copy submitted for recordation must be legible per the requirements of §201.4(c)(3).

(2) The fee for recordation of a document is prescribed in §201.3(c).

(3) The date of recordation is the date when all of the elements required for recordation, including the prescribed fee and, if required, the statement referred to in paragraph (f)(1)(ii) of this section, have been received in the Copyright Office. After recordation, the document, including any accompanying statement, is returned to the sender with a certificate of record.

(4) Notwithstanding anything to the contrary in this section, the Copyright Office reserves the right to refuse recordation of a notice of termination as such if, in the judgment of the Copyright Office, such notice of termination is untimely. Conditions under which a notice of termination will be considered untimely include: the effective date of termination does not fall within the five-year period described in section 203(a)(3) or section 304(c)(3), as applicable, of title 17, United States Code;

501

or the documents submitted indicate that the notice of termination was served less than two or more than ten years before the effective date of termination. If a notice of termination is untimely or if a document is submitted for recordation as a notice of termination on or after the effective date of termination, the Office will offer to record the document as a "document pertaining to copyright" pursuant to § 201.4(c)(3), but the Office will not index the document as a notice of termination.

(5) In any case where an author agreed, prior to January 1, 1978, to a grant of a transfer or license of rights in a work that was not created until on or after January 1, 1978, a notice of termination of a grant under section 203 of title 17 may be recorded if it recites, as the date of execution, the date on which the work was created.

(6) A copy of the notice of termination shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect. However, the fact that the Office has recorded the notice does not mean that it is otherwise sufficient under the law. Recordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction.

(7) Notices of termination should be submitted to the address specified in § 201.1(b)(2).

(Pub. L. 94–553: 17 U.S.C. 304(c), 702, 708(11))

[42 FR 45920, Sept. 13, 1977, as amended at 56 FR 59885, Nov. 26, 1991; 60 FR 34168, June 30, 1995; 64 FR 29521, June 1, 1999; 64 FR 36574, July 7, 1999; 66 FR 34372, June 28, 2001; 67 FR 69136, Nov. 15, 2002; 67 FR 78176, Dec. 23, 2002; 68 FR 16959, Apr. 8, 2003; 71 FR 36486, June 27, 2006; 74 FR 12556, Mar. 25, 2009; 76 FR 32320, June 6, 2011]

§ 201.11 Satellite carrier statements of account covering statutory licenses for secondary transmissions.

(a) General. This section prescribes rules pertaining to the deposit of Statements of Account and royalty fees in the Copyright Office as required by the satellite carrier license of section 119(b)(1) and Section 122(a) of title

17 of the United States Code, as amended by Pub. L. No. 111–175, in order that certain secondary transmissions by satellite carriers for private home viewing be subject to statutory licensing.

(b) Definitions. (1) The terms distributor, network station, private home viewing, satellite carrier, subscribe, subscriber, non-network station, unserved household, primary stream, and multicast stream, have the meanings set forth in Section 119(d) of title 17 of the United States Code, as amended by Pub. L. No. 111–175.

(2) The terms primary transmission and secondary transmission have the meanings set forth in section 111(f) of title 17 of the United States Code.

(c) Accounting periods and deposit. (1) Statements of Account shall cover semiannual accounting periods of January 1 through June 30, and July 1 through December 31, and shall be deposited in the Copyright Office, together with the total statutory royalty fee or the confirmed arbitration royalty fee for such accounting periods as prescribed by section 119(b)(1)(B) and (c)(3) of title 17, by not later than July 30, if the Statement of Account covers the January 1 through June 30 accounting period, and by not later than the immediately following January 30, if the Statement of Account covers the July 1 through December 31 accounting period.

(2) Upon receiving a Statement of Account and royalty fee, the Copyright Office will make an official record of the actual date when such statement and fee were physically received in the Copyright Office. Thereafter, the Licensing Division of the Copyright Office will examine the statement and fee for obvious errors or omissions appearing on the face of the documents, and will require that any such obvious errors or omissions be corrected before final processing of the documents is completed. If, as the result of communications between the Copyright Office and the satellite carrier, an additional fee is deposited or changes or additions are made in the Statement of Account, the date that additional deposit or information was actually received in the Office will be added to the official

THE LAW OF COPYRIGHT                    App. 4–2

| 94TH CONGRESS | HOUSE OF | REPORT |
|---|---|---|
| 2d Session | REPRESENTATIVES | No. 94-1476 |

## COPYRIGHT LAW REVISION

---

SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House
on the State of the Union and ordered to be printed

---

Mr. KASTENMEIER, from the Committee on the
Judiciary, submitted the following

## REPORT
### together with
## ADDITIONAL VIEWS
[To accompany S. 22]

The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copyright law, title 17 of the United States Code, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

[Editor's note: At this point the entire copyright bill as reported out by the House Committee was set forth. Only those portions of the bill which are *not* identical to the Copyright Act as finally enacted are reproduced here.]

The amendments are as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SEC. 101. Title 17 of the United States Code, entitled "Copyrights", is hereby amended in its entirety to read as follows:

• • •

[5] § 105. Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise:

reserved. This presumption would be reversed under the bill, since a specific written conveyance of rights would be required in order for a sale of any material object to carry with it a transfer of copyright.

## SECTION 203. TERMINATION OF TRANSFERS AND LICENSES

### The problem in general

The provisions of section 203 are based on the premise that the reversionary provisions of the present section on copyright renewal (17 U.S.C. sec. 24) should be eliminated, and that the proposed law should substitute for them a provision safeguarding authors against unremunerative transfers. A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved.

### Scope of the provision

Instead of being automatic, as is theoretically the case under the present renewal provision, the termination of a transfer or license under section 203 would require the serving of an advance notice within specified time limits and under specified conditions. How-[125]ever, although affirmative action is needed to effect a termination, the right to take this action cannot be waived in advance or contracted away. Under section 203(a) the right of termination would apply only to transfers and licenses executed after the effective date of the new statute, and would have no retroactive effect.

The right of termination would be confined to inter vivos transfers or licenses executed by the author, and would not apply to transfers by the author's successors in interest or to the author's own bequests. The scope of the right would extend not only to any "transfer of copyright ownership," as defined in section 101, but also to non-exclusive licenses. The right of termination would not apply to "works made for hire," which is one of the principal reasons the definition of that term assumed importance in the development of the bill.

(Matthew Bender & Co., Inc.)                    (Rel 34–12/93  Pub 465)

three months after publication). These provisions would be applicable to works of foreign and domestic origin alike.

In providing that statutory damages and attorney's fees are not recoverable for infringement of unpublished, unregistered works, clause (1) of section 412 in no way narrows the remedies available under the present law. With respect to published works, clause (2) would generally deny an award of those two special remedies where infringement takes place before registration. As an exception, however, the clause provides a grace period of three months after publication during which registration can be made without loss of remedies; full remedies could be recovered for any infringement begun during the three months after publication if registration is made before that period has ended. This exception is needed to take care of newsworthy or suddenly popular works which may be infringed almost as soon as they are published, before the copyright owner has had a reasonable opportunity to register his claim.

## SECTION 501. INFRINGEMENT OF COPYRIGHT

The bill, unlike the present law, contains a general statement of what constitutes infringement of copyright. Section 501(a) identifies a copyright infringer as someone who "violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118" of the bill, or who imports copies or phonorecords in violation of section 602. Under the latter section an unauthorized importation of copies or phonorecords acquired abroad is an infringement of the exclusive right of distribution under certain circumstances.

The principle of the divisibility of copyright ownership. established by section 201(d), carries with it the need in infringement actions to safeguard the rights of all copyright owners and to avoid a multiplicity of suits. Subsection (b) of section 501 enables the owner of a particular right to bring an infringement action in that owner's name alone, while at the same time insuring to the extent possible that the other owners whose rights may be affected are notified and given a chance to join the action.

[159] The first sentence of subsection (b) empowers the "legal or beneficial owner of an exclusive right" to bring suit for "any infringement of that particular right committed while he or she is the owner of it." A "beneficial owner" for this purpose would

include, for example, an author who had parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees.

The second and third sentences of section 501(b), which supplement the provisions of the Federal Rules of Civil Procedure, give the courts discretion to require the plaintiff to serve notice of the plaintiff's suit on "any person shown, by the records of the Copyright Office or otherwise, to have or claim an interest in the copyright"; where a person's interest "is likely to be affected by a decision in the case" a court order requiring service of notice is mandatory. As under the Federal rules, the court has discretion to require joinder of "any person having or claiming an interest in the copyright"; but, if any such person wishes to become a party, the court must permit that person's intervention.

In addition to cases involving divisibility of ownership in the same version of a work, section 501(b) is intended to allow a court to permit or compel joinder of the owners of rights in works upon which a derivative work is based.

Section 501 contains two provisions conferring standing to sue under the statute upon broadcast stations in specific situations involving secondary transmissions by cable systems. Under subsection (c), a local television broadcaster licensed to transmit a work can sue a cable system importing the same version of the work into the broadcaster's local service area in violation of section 111(c). Subsection (d) deals with cases arising under section 111(c)(3), the provision dealing with substitution or alteration by a cable system of commercials or other programming; in such cases standing to sue is also conferred on: (1) the primary transmitter whose transmission has been altered by the cable system, and (2) any broadcast stations within whose local service area the secondary transmission occurs. These provisions are linked to section 509, a new provision on remedies for alteration of programming by cable systems, discussed below.

*Vicarious liability for infringing performances*

The committee has considered and rejected an amendment to this section intended to exempt the proprietors of an establishment, such as a ballroom or night club, from liability for copyright infringement committed by an independent contractor, such as an orchestra laeder [sic]. A well-established principle of copyright law is that a person who violates any of the exclusive rights

# Black's Law Dictionary®

## Eighth Edition

Bryan A. Garner
Editor in Chief



THOMSON

WEST

Mat #40231642
Mat #40235008—deluxe

personality theory                                                                1180

law regards a human being or an artificial entity as a person. — Also termed *legal personality*.

> "Legal personality . . . refers to the particular device by which the law creates or recognizes units to which it ascribes certain powers and capacities." George Whitecross Paton, *A Textbook of Jurisprudence* 393 (G.W. Paton & David P. Derham eds., 4th ed. 1972).

**2.** *Parliamentary law. usu. pl.* An improper reference to a member by name or in his or her personal capacity.

> "No person is to mention a member then present by his name; but to describe him by his seat in the house or who spoke last, or on the other side of the question, nor to digress from the matter to fall upon the person, by speaking, reviling, nipping, or unmannerly words against a particular member. The consequences of a measure may be reprobated in strong terms; but to arraign the motives of those who propose or advocate it, is a personality, and against order." Thomas Jefferson, *A Manual of Parliamentary Practice* 36–37 (1801) (citations omitted).

**personality theory.** *Intellectual property.* A rationalization of intellectual-property laws, esp. copyright, drawing on the philosophy of G.W.F. Hegel, holding that personal expression is a form of self-actualization that gives the creator inalienable moral rights in the creations. ● As a way of analyzing intellectual-property rights, personality theory takes the point of view of the individual inventor, author, or artist rather than that of society as a whole. Cf. LOCKEAN LABOR THEORY; UTILITARIANISM.

**personal judgment.** See JUDGMENT.

**personal jurisdiction.** See JURISDICTION.

**personal justice.** See JUSTICE (1).

**personal knowledge.** See KNOWLEDGE.

**personal law.** The law that governs a person's family matters, usu. regardless of where the person goes. ● In common-law systems, personal law refers to the law of the person's domicile. In civil-law systems, it refers to the law of the individual's nationality (and so is sometimes called *lex patriae*). Cf. TERRITORIAL LAW.

> "The idea of the personal law is based on the conception of man as a social being, so that those transactions of his daily life which affect him most closely in a personal sense, such as marriage, divorce, legitimacy, many kinds of capacity, and succession, may be governed universally by that system of law deemed most suitable and adequate for that purpose . . . . [Although the law of the domicile is the chief criterion adopted by English courts for the personal law, it ties within the power of any man of full age and capacity to establish his domicile in any country he chooses, and thereby automatically to make the law of that country his personal law." R.H. Graveson, *Conflict of Laws* 188 (7th ed. 1974).

**personal liability.** See LIABILITY.

**personal liberty.** See LIBERTY.

**personal name.** See NAME.

**personal notice.** See NOTICE.

**personal obligation.** See OBLIGATION.

**personal privilege.** See PRIVILEGE (5).

**personal property.** See PROPERTY.

**personal-property tax.** See TAX.

**personal recognizance.** See RECOGNIZANCE.

**personal replevin.** See REPLEVIN.

**personal representative.** See REPRESENTATIVE.

**personal reputation.** See REPUTATION.

**personal-residence trust.** See TRUST.

**Personal Responsibility and Work Opportunity Reconciliation Act.** A 1996 federal law that overhauled the welfare system, as well as requiring states to provide a means for collecting child support by (1) imposing liens on a child-support obligor's assets and (2) facilitating income-withholding. ● The Act did away with Aid to Families with Dependent Children in favor of Temporary Assistance to Needy Families. It also limited the length of time that persons could receive welfare and tied states' receipt of federal child-support funds to their implementing enhanced paternity-establishment services. — Abbr. PRWORA. — Also termed *Welfare Reform Act*. See AID TO FAMILIES WITH DEPENDENT CHILDREN; TEMPORARY ASSISTANCE TO NEEDY FAMILIES.

**personal right.** See RIGHT.

**personal security.** See SECURITY.

**personal service. 1.** Actual delivery of the notice or process to the person to whom it is directed. — Also termed *actual service*. [Cases: Federal Civil Procedure ⊜413; Process ⊜48, 64. C.J.S. *Process* §§ 26, 33, 42–44, 49.] **2.** An act done personally by an individual. ● In this sense, a personal service is an economic service involving either the intellectual or manual personal effort of an individual, as opposed to the salable product of the person's skill.

**personal servitude.** See SERVITUDE (2).

**personal statute.** See STATUTE.

**personal suretyship.** See SURETYSHIP.

**personal tithe.** See TITHE.

**personal tort.** See TORT.

**personal treaty.** See TREATY (1).

**personal trust.** See *private trust* under TRUST.

**personalty** (pers-an-al-tee). Personal property as distinguished from real property. See *personal property* (1) under PROPERTY. [Cases: Property ⊜1. C.J.S. *Property* §§ 11–21, 23.]

> *quasi-personalty.* Things that are considered movable by the law, though fixed to real property either actually (as with a fixture) or fictitiously (as with a lease for years).

**personal warrandice.** See WARRANDICE.

**personal warranty.** See WARRANTY (2).

**personal wrong.** See WRONG.

**personam.** See IN PERSONAM.

*persona miserabilis.* See PERSONA.

*persona moralis.* See PERSONA.

*persona nasciturus.* See PERSONA.

**persona non grata** (par-sohn-a non grah-da), *n.* [Latin] An unwanted person; esp., a diplomat who is not acceptable to a host country. Pl. **personae non gratae.** Cf. PERSONA GRATA.

*persona praedilecta.* See PERSONA.

representation, estoppel by

1328

*false representation.* See MISREPRESENTATION.

*material representation.* A representation to which a reasonable person would attach importance in deciding his or her course of action in a transaction. • Material representation is a necessary element of an action for fraud. [Cases: Contracts ⟋94(2); Fraud ⟋18. C.J.S. *Contracts* §§ 156, 166.]

*promissory representation.* A representation about what one will do in the future; esp. a representation made by an insured about what will happen during the time of coverage, stated as a matter of expectation and amounting to an enforceable promise. [Cases: Insurance ⟋3035. C.J.S. *Insurance* §§ 537, 546–551, 629, 634, 639, 694, 704, 759.]

2. The act or an instance of standing for or acting on behalf of another, esp. by a lawyer on behalf of a client <Clarence Darrow's representation of John Scopes>. [Cases: Attorney and Client ⟋77–104. C.J.S. *Attorney and Client* §§ 191–217.]

*concurrent representation.* The simultaneous representation of more than one person in the same matter. See CONFLICT OF INTEREST (2).

3. The fact of a litigant's having such a close alignment of interests with another person that the other is considered as having been present in the litigation <the named plaintiff provided adequate representation for the absent class members>.

*adequate representation.* A close alignment of interests between actual parties and potential parties in a lawsuit, so that the interests of potential parties are sufficiently protected by the actual parties. • The concept of adequate representation is often used in procedural contexts. For example, if a case is to be certified as a class action, there must be adequate representation by the named plaintiffs of all the potential class members. Fed. R. Civ. P. 23(a)(4). And if a nonparty is to intervene in a lawsuit, there must not already be adequate representation of the nonparty by an existing party. Fed. R. Civ. P. 24(a)(2).

*virtual representation.* A party's maintenance of an action on behalf of others with a similar interest, as a class representative does in a class action. See VIRTUAL-REPRESENTATION DOCTRINE. [Cases: Judgment ⟋677; Parties ⟋35.5. C.J.S. *Judgments* §§ 847, 851–854; *Parties* § 28.]

4. The assumption by an heir of the rights of his or her predecessor <each child takes a share by representation>. See PER STIRPES. [Cases: Wills ⟋550. C.J.S. *Wills* §§ 1809–1810.] 5. *(1999)* *pl.) Int'l law.* A friendly but firm statement of a perceived wrong. • This is the mildest form of complaint that one nation can make to another. — Also termed *diplomatic representation.* — represent, *vb.*

"Representations are in the nature of vigorous arguments employed in the hope of securing a modification of the action complained of without implying necessarily or expressly an intention ultimately to seek redress by more vigorous means." Ellery C. Stowell, *International Law: A Restatement of Principles in Conformity with Actual Practice* 427 (1931).

**representation, estoppel by.** See *estoppel by representation* under ESTOPPEL.

**representation election.** See ELECTION (3).

**representative,** *n.* 1. One who stands for or acts on behalf of another <the owner was the football team's representative at the labor negotiations>. See AGENT. [Cases: Principal and Agent ⟋1. C.J.S. *Agency* §§ 2, 4–6, 23, 25–27, 33, 38–40, 58; *Architects* § 21.]

*accredited representative.* A person with designated authority to act on behalf of another person, group, or organization, usu. by being granted that authority by law or by the rules of the group or organization <as an officer of the union, she was the accredited representative of the employees in the wage dispute>.

*class representative.* A person who sues on behalf of a group of plaintiffs in a class action. — Also termed *named plaintiff.* See CLASS ACTION. [Cases: Federal Civil Procedure ⟋164; Parties ⟋35.13. C.J.S. *Parties* §§ 34, 34.1.]

*independent personal representative.* See *personal representative.*

*lawful representative.* 1. A legal heir. 2. An executor, administrator, or other legal representative. — Also termed *legal representative.* See *personal representative.* [Cases: Executors and Administrators ⟋14–18. C.J.S. *Executors and Administrators* §§ 17–32, 34–49.]

*legal-personal representative.* 1. When used by a testator referring to personal property, an executor or administrator. [Cases: Executors and Administrators ⟋14–18. C.J.S. *Executors and Administrators* §§ 17–32, 34–49.] 2. When used by a testator referring to real property, one to whom the real estate passes immediately upon the testator's death. 3. When used concerning the death of a mariner at sea, the public administrator, executor, or appointed administrator in the seaman's state of residence.

*legal representative.* 1. See *lawful representative.* 2. See *personal representative.*

*personal representative.* A person who manages the legal affairs of another because of incapacity or death, such as the executor of an estate. • Technically, while an executor is a personal representative named in a will, an administrator is a personal representative not named in a will. — Also termed *independent personal representative; legal representative.* [Cases: Executors and Administrators ⟋14–18. C.J.S. *Executors and Administrators* §§ 17–32, 34–49.]

*registered representative.* A person approved by the SEC and stock exchanges to sell securities to the public. — Formerly also termed *customer's man; customer's person.* [Cases: Securities Regulation ⟋40.12–40.14. C.J.S. *Securities Regulation* §§ 157–160, 165.]

2. A member of a legislature, esp. of the lower house <one senator and one representative attended the rally>. [Cases: States ⟋28. C.J.S. *States* § 42.] — Abbr. rep.

**representative action.** 1. CLASS ACTION. 2. DERIVATIVE ACTION.

**representative capacity.** See CAPACITY (4).

## PROOF OF SERVICE BY MAIL

I am a citizen of the United States and employed in the County of Los Angeles, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 2049 Century Park East, Suite 3400, Los Angeles, California 90067-3208. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On September 18, 2013, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document(s): **APPELLANT'S OPENING BRIEF** in a sealed envelope, postage fully paid, addressed as follows:

Marc Toberoff, Esq.
Keith Gregory Adams, Esq.
TOBEROFF & ASSOCIATES, P.C.
22337 Pacific Coast Highway #348
Malibu, California 90265
Phone: (310) 246-3333
Fax: (310) 246-3101
Email: mtoberoff@toberoffandassociates.com
        kadams@toberoffandassociates.com

Attorneys for Defendants, Raenee Robinson, Ray Charles Robinson, Jr., Sheila Robinson, David Robinson, Robert F. Robinson, Reatha Butler, and Robyn Moffett

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 18, 2013, at Los Angeles, California.

_Maria G. Garcia_
Maria G. Garcia

60705545.1